2015 CO 14

**Randal ANKENEY, Petitioner–Appellee**

v.

**Rick RAEMISCH, Executive Director of Colorado Department of Corrections, and Rae Timme, Warden of the Fremont Correctional Facility, Respondents–Appellants.**

**Supreme Court Case No. 13SA336**

Supreme Court of Colorado.

March 16, 2015

Attorneys for Petitioner–Appellee: Killmer, Lane & Newman, LLP, David A. Lane, Danielle C. Jefferis, Denver, Colorado

Attorneys for Respondents–Appellants: Cynthia H. Coffman, Attorney General, James X. Quinn, First Assistant Attorney General, Denver, Colorado

JUSTICE COATS delivered the Opinion of the Court.

¶ 1 The Department of Corrections appealed directly to this court from an order of the district court granting Ankeney habeas corpus relief. Complying with a remand order of the court of appeals from an earlier appeal, the district court interpreted various

statutory provisions regarding good time and earned time credit to require Ankeney's release from prison, almost three years before the date calculated by the department. Crediting the time during which Ankeney remained unlawfully incarcerated, according to this interpretation, against his subsequent, statutorily mandated period of parole, the district court also found him to have completed his parole term, and it therefore ordered his immediate release from parole supervision.

¶2 Because the lower courts erroneously concluded that for inmates convicted of crimes committed after July 1, 1993, good time credits awardable by section 17–22.5–301, C.R.S. (2014), are to be applied against an inmate's mandatory release date rather than merely to determine his parole eligibility; and because a proper application of the statutory deductions from his sentence to which Ankeney is entitled demonstrates that he has not completed service of his required term of parole, the judgment of the district court is reversed.

## I.

¶3 Randal Ankeney was convicted of, among other things, class four felony child abuse, for which he was sentenced on January 4, 2008 to a prison term of eight years plus three years of statutorily mandated parole.[1] Accounting for his presentence confinement, the Department of Corrections set his mandatory release date at October 19, 2015. Although he became eligible for parole according to the department's calculations in 2010, he was denied parole by the State Board of Parole.

¶4 On January 27, 2012, almost four years before the date upon which the department initially calculated his release from prison to be required, Ankeney filed a pleading in the district court combining a petition for a writ of habeas corpus and a complaint for relief in the nature of mandamus. His pleading sought an order compelling the recalculation of his mandatory release date and, based on that recalculation, his immediate release from the custody of the department. In this pleading Ankeney asserted that he was statutorily entitled to good time and earned time credits beyond the credits allowed by the department and, importantly, that all of the good time and earned time credits to which he claimed entitlement should have been applied not only to determine the date on which he would become eligible to be considered for parole, but also to the calculation of his mandatory release from prison. According to his own calculations, his release from prison to begin serving his three-year term of parole became mandatory on November 19, 2011. The district court agreed with the department's statutory interpretation, denied habeas relief, and dismissed the complaint for relief in the nature of mandamus.

¶5 On direct appeal from that order, the intermediate appellate court reversed and remanded for reconsideration of Ankeney's claims for both mandamus and habeas relief.[2] Relying entirely on prior pronouncements of this court, the appellate court reasoned that under a "discretionary parole scheme," good and earned time credits merely go to establishing a date for parole eligibility, but under a "mandatory parole scheme," good and earned time credits actually go toward establishing the date upon which a prisoner must be released on parole. Further finding that Ankeney, because he was serving a sentence for a felony committed after 1993, was subject to a "mandatory parole scheme," the appellate court concluded that he had a clear right to have good time credits awardable under section 17–22.5–301, C.R.S. (2014), and

---

1. Ankeney also received lesser sentences for stalking and sexual assault, which were ordered to run concurrently with his longer sentence for child abuse. There is no assertion in this case that those convictions or sentences affected his mandatory release date or required term of parole.

2. Though it lacked jurisdiction under section 13–4–102(1)(e), C.R.S. (2014), to review the district court's denial of Ankeney's petition for writ of habeas corpus, the court of appeals nonetheless directed the district court to reconsider its habeas ruling on remand, finding that the habeas ruling was "based on the same erroneous reasoning which underlay its mandamus ruling." Questions concerning the relationship between habeas corpus and mandamus, or of the court of appeals' jurisdiction to address either, are not before us.

"education earned time credits" apply toward establishing the appropriate date for his mandatory release to parole.

¶ 6 The department chose not to petition this court for further review of that judgment after determining that Ankeney was entitled to be released to parole notwithstanding the court of appeals' judgment based solely on his accrual of earned time credits pursuant to section 17–22.5–405, C.R.S. (2014), which, unlike Ankeney's claim to good time and education earned time, the department did not dispute as applying toward Ankeney's mandatory release date. *See* § 17–22.5–402(2), C.R.S. (2014) (providing that the full term of an inmate's sentence shall be reduced by any earned time granted pursuant to section 17–22.5–405). Based on Ankeney's earned time credits, the department recalculated his mandatory release date as August 28, 2013 and released him from prison on that date to begin serving his three-year statutorily mandated period of parole.

¶ 7 After permitting Ankeney to amend his pleading to account for the fact that he had since been released to parole, the district court implemented what it understood to be the mandate of the court of appeals and found that Ankeney should have been released from prison to parole on October 28, 2010. Apparently assuming that the period during which he remained unlawfully incarcerated must be credited against his three-year parole period, the district court additionally found that he should have been released from parole no later than October 28, 2013. On November 18, 2013, specifically referencing the court of appeals' remand order, the district court therefore ordered the immediate termination of Ankeney's parole.[3]

¶ 8 In the absence of initial jurisdiction residing in the court of appeals in matters concerning writs of habeas corpus, *see* § 13–4–102(1)(e), C.R.S. (2014), the department appealed directly to this court, challenging the district court's determination of the date upon which Ankeney's release from prison was mandated by statute and its resulting order of immediate release.[4]

## II.

¶ 9 As we have recounted in greater detail elsewhere, *see, e.g., People v. Norton,* 63 P.3d 339, 343 (Colo.2003); *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002); *Martin v. People,* 27 P.3d 846, 864–66 (Colo.2001); *Thiret v. Kautzky,* 792 P.2d 801, 803–05 (Colo.1990), the nature of criminal sentencing in this jurisdiction, including the treatment of parole supervision, has undergone several dramatic changes in philosophy since the late 1970s. Until 1979, criminal courts were required to sentence convicted felons to an indeterminate term with fixed minimum and maximum limits, leaving to the parole board tremendous discretion within that range to determine whether, when, and for how long to release an inmate to parole. In a sentencing scheme of that nature, parole effectively amounted to nothing more than an alternate method of serving a sentence to incarceration. *Craig v. People,* 986 P.2d 951, 958 n.3 (Colo.1999). In 1979, the legislature enacted what we have

3. In his "Amended Petition" Ankeney requested only "that the Court deny the relief requested in the Respondents' Brief and issue a Writ of Habeas Corpus compelling Respondents to show cause why Petitioner should not be immediately released from all incarceration." The district court's initial ruling on the amended petition included nothing more than the words "Order Granting Habeas Corpus Relief," and its subsequent, more detailed "Order" concluded by expressly ordering "that the petition is GRANTED, on both habeas corpus and declaratory relief, and the petitioner's parole shall be terminated immediately." Notwithstanding the remand order of the court of appeals, neither the amended petition nor the district court's resolution makes any reference to C.R.C.P. 106 or mandamus relief.

4. The department also challenged the district court's authority to terminate Ankeney's parole in the absence of personal jurisdiction over the parole board. At least where the inmate's designation of a custodian was correct at the time the petition was filed; where in lieu of issuing a writ to the custodian as required by statute, the district court ordered service on the attorney general who represented both the department and the parole board; and where the only disputed issues involved the department's calculation of the inmate's mandatory release date rather than any action by the parole board, the department's contention concerning personal jurisdiction lacks merit, whether or not the department could otherwise be considered a custodian of an inmate already released to parole.

elsewhere referred to as a "determinate sentencing system," in which a felony offender was sentenced to a specific term of years, with an additional statutorily mandated term of parole to be served upon discharge from incarceration. *See Thiret*, 792 P.2d at 803–04. As we held at the time, in that particular sentencing scheme the parole board lost all discretion concerning whether, when, and for how long to release an offender to parole: He could not be released before he became eligible; he had to be released upon becoming eligible; and his term of parole was set by statute rather than the parole board. *See id.*

¶ 10 Despite some relatively minor alterations, that sentencing system essentially remained in effect until mid–1985, when the legislature enacted what we have referred to as a "modified determinate sentencing system," restoring discretion to the parole board to determine whether, when, and for how long to release an offender to parole, within a range extending from the date upon which the offender became eligible for parole until the date upon which he had fully discharged his sentence. *See id.*; *Renneke v. Kautzky*, 782 P.2d 343, 346 (Colo.1989). Finally, in 1993, the legislature fundamentally altered the sentencing scheme once again, this time leaving discretion with the parole board to determine whether to release an offender to parole sometime before his release would have been required but imposing statutorily prescribed periods of parole for most classes of offenders, which parole terms became a separate component of the sentence, to be fully served whether the offender had already completed his full term of incarceration or not. *See Norton*, 63 P.3d at 343; *see also* § 18–1.3–401(1)(a)(V)(D), C.R.S. (2014) ("When an offender is released by the state board of parole or released because the offender's sentence was discharged pursuant to law, the mandatory period of parole shall be served by such offender.").

¶ 11 Over a similar period, the legislature enacted substantial, although not always directly corresponding, changes to the statutes prescribing the calculation of both parole eligibility and ultimate discharge dates. For crimes committed before July 1, 1979, the statutory scheme provided for credit against an indeterminate sentence to account for good time, and what we came to refer to as "trusty time" and "meritorious time." *See* §§ 17–22.5–201 to –203, C.R.S. (2014); *Thiret*, 792 P.2d at 804. For crimes committed on or after July 1, 1979, the statutory scheme provided for good time and earned time to be deducted from an inmate's sentence, *see* §§ 17–22.5–301 to –307, C.R.S. (2014), and eventually allowed additional credit for making positive progress in the correctional literacy and education programs, § 17–22.5–302(1.5). In a series of cases, we explained that the good time credits provided by section 301 and earned time credits provided by section 302(1) were not to be treated as the actual service of a sentence but merely served to reduce the term before the completion of which an inmate would not be eligible for parole. *Jones v. Martinez*, 799 P.2d 385, 387 (Colo.1990); *Thiret*, 792 P.2d at 805; *Bynum v. Kautzky*, 784 P.2d 735, 738–39 (Colo.1989); *Renneke*, 782 P.2d at 345.

¶ 12 In 1990, however, the legislature added an entirely new statutory scheme for parole eligibility and discharge from custody contained in part 4 of title 17, article 22.5, expressly making it applicable to all those offenders sentenced for crimes committed on or after July 1, 1979, other than those expressly excluded, *see* § 17–22.5–406(1), C.R.S. (2014). Of particular note, the new statutory scheme abandoned the concept of good time altogether, *Martin*, 27 P.3d at 850 (explaining that part 4 "remov[ed] the concept of good time"),[5] and created an entirely new formula for parole eligibility, making most felony offenders eligible after the service of fifty percent of the sentence imposed upon them, less earned time granted in accordance with the provisions of the new statutory scheme, *see* § 17–22.5–403(1), C.R.S.

---

5. Legislative recordings from part 4's original enactment include expert testimony from a representative of the department explaining that, under part 4, "[t]he phrase good time is done away with. In this scenario, you're just eligible for parole at fifty percent. It's not called good time." First meeting of the Conference Comm. on H.B. 1327 at approx. 7:30 p.m., 57th Gen. Assemb., 2d Sess. (May 7, 1990).

(2014); and in addition, it provided that earned time granted under this scheme would serve to reduce the full term for which the inmate had been sentenced, § 17–22.5–402(2).[6] Because the new 1990 scheme, however, expressly excluded offenders failing to meet certain criteria from its coverage, *see* § 17–22.5–406(3) ("This part 4 shall not apply to . . . ."), or at least from the coverage of certain of its provisions, *see, e.g.,* § 17–22.5–406(1)(e) (discharge date of some offenders not to be determined by provisions of part 4), and required instead that the sentences of those offenders, or at least their release dates, be governed by pre-existing statutory provisions, the good time and earned time provisions of part 3 of article 22.5 were neither repealed nor completely displaced by part 4, continuing to govern, as they do, the sentences of these excluded post–1979 offenders.

¶ 13 The rationale advanced by Ankeney for concluding that he had not only passed his mandatory release date but had in fact also been unlawfully confined beyond that date for a period sufficiently long to also satisfy the parole component of his sentence[7] rests upon the correctness of his interpretative differences with the department on two critical points. The validity of Ankeney's assertion that he has discharged his entire sentence and is entitled to release even from parole is contingent upon his entitlement to certain credits awardable according to part 3 of article 22.5, which were not separately allowed by the department, as well as his entitlement to have those credits applied to the calculation of his mandatory release date, as distinguished from his parole eligibility date. Apparently understanding that the department had already applied section 301 good time credits to the calculation of Ankeney's parole eligibility date, the court of appeals addressed itself only to the question whether those credits should also have been applied to the calculation of his mandatory release date. Taking Ankeney's entitlement to section 301 good time credits for at least some purpose as accepted, the intermediate appellate court therefore found that because he was subject to a mandatory parole scheme, Ankeney was entitled to have good time credits under section 301, as well as "education earned time" credits, applied toward establishing his mandatory release date. While determining his entitlement to the additional education earned time credits he claims pursuant to section 302 turned out to be unnecessary for the district court's ruling that he was entitled to immediate discharge from his mandatory parole, Ankeney continues to assert his entitlement to these additional education credits, should they become consequential to our disposition of his case.[8]

---

6. In 2009, subsection 402(2) was amended to include as well a new category of credit dubbed "earned release time," which similarly would serve to reduce the sentence originally imposed.

7. Because we find that Ankeney was not incarcerated past his mandatory release date, we need not decide whether excessive time served in prison may be credited against an inmate's mandatory period of parole. *Cf. Edwards v. People,* 196 P.3d 1138, 1139 (Colo.2008) (holding that parolee was entitled to have presentence confinement credit deducted from the parole portion of his sentence pursuant to terms of statute governing application of presentence confinement credit to an inmate's sentence). *But see* § 18–1.3–401(1)(a)(V)(B), (D), C.R.S. (2014) (any inmate who is paroled or who is not paroled and discharged pursuant to law shall be subject to a mandatory period of parole); *Craig,* 986 P.2d at 961–62 (holding that "terms of imprisonment and mandatory parole terms are distinct elements of the sentencing regime"); *Luther,* 58 P.3d at 1015 (holding that current sentencing regime "does not permit parties or the trial courts to waive or suspend any portion of the mandatory period of parole, but vests in the state board of parole the exclusive authority to release an offender from his or her designated parole period after a determination that the offender has been sufficiently rehabilitated and can no longer benefit from the parole supervision").

8. In addition, in the statement of prior proceedings section of his Answer Brief, Ankeney baldly asserts (without citation to authority) both that this court lacks jurisdiction over mandamus actions and that the department's failure to appeal the court of appeals' remand order renders any determination we make concerning the applicable statutes moot with regard to Ankeney. Our jurisdiction over any particular class of actions is clearly not limited by a legislative grant of concurrent jurisdiction to an intermediate appellate court, and we have held that we are not bound by the decisions of the court of appeals in a prior appeal even after remand and a second round of appellate proceedings. *Giampapa v. Am. Family Mut. Ins. Co.,* 64 P.3d 230, 243 (Colo.2003) (cit-

## A.

¶ 14 With regard to the court of appeals' holding that Ankeney was subject to a "mandatory system of parole," which that court found to be dispositive of the question whether an inmate is entitled to the application of good time and earned time credits toward establishing his mandatory release date, the appellate court simply misread our applicable jurisprudence. We have consistently held that the good time credits awardable by section 17–22.5–301 and the earned time credits awardable by section 17–22.5–302(1), the specific statutory credits at issue in our applicable holdings, do not constitute the service of an inmate's sentence but rather have significance only for calculating his eligibility for release to parole. *Jones,* 799 P.2d at 387; *Thiret,* 792 P.2d at 805; *Bynum,* 784 P.2d at 738–39; *Renneke,* 782 P.2d at 345. With regard to the particular determinate sentencing system governing crimes committed between mid–1979 and mid–1985, however, we have also observed that the lack of parole board discretion to decide when to release an inmate to parole has the necessary effect of rendering identical an inmate's mandatory release and parole eligibility dates. *See Thiret,* 792 P.2d at 805. We have characterized that sentencing system as including a "mandatory parole scheme" for the reason that it bars an inmate's release from incarceration except to mandatory parole and, upon his becoming eligible, the parole board lacks the discretion to deny his release. *See id.* at 804–05. Contrary to the court of appeals' understanding, we have never suggested, and it is clearly not the case, that this same equivalence of parole and mandatory release dates applies with regard to every parole scheme to which the term "mandatory parole scheme" might fairly be applied, or that the good and earned time credits awardable by sections 301 and 302(1) have ever been construed to apply to the calculation of an inmate's mandatory release date, except to the extent that his mandatory release date necessarily coincides with his parole eligibility date.

¶ 15 The 1993 amendments to the sentencing statutes have been characterized as in-

cluding a "mandatory parole scheme" or "mandatory parole" only in the sense that for many defendants convicted of committing felonies after that date, a specific, statutorily mandated period of parole attaches as a separate component of their sentences. *See Badger v. Suthers,* 985 P.2d 1042, 1043 n.1 (Colo.1999) ("It is important to distinguish between 'mandatory parole' as used in the sense that an offender must be released or placed on parole upon expiration of a sentence less good time and earned time deductions ... and 'mandatory period of parole' meaning a period of parole that an offender must serve following his or her discharge from imprisonment." (citations omitted)). Under this sentencing scheme, the parole board retains the discretion to release, or not to release, an offender anytime between the date upon which he becomes eligible for parole and the date upon which he must, by statute, be released from incarceration to begin serving his statutorily mandated period of parole. In light of this discretion retained by the parole board, an inmate's parole eligibility date and his mandatory release date are not rendered identical, as in the mid–1979 through mid–1985 sentencing scheme, and therefore a credit against the inmate's parole eligibility date will not similarly impact his mandatory release date. *See Thiret,* 792 P.2d at 805.

¶ 16 Apart from the court of appeals' rationale concerning mandatory parole schemes, Ankeney argues more straightforwardly that a proper construction of the language of sections 301 and 302 itself requires the conclusion that the credits allowed by those provisions apply to a determination of his mandatory release date. While Ankeney's reasoning is not without color, the proper construction of part 3 in this regard has been resolved for almost a quarter of a century, and we see nothing in Ankeney's argument to cause us to revisit that resolution. At least by the time of our decision in *Thiret,* we made clear that the complex of applicable sentencing statutes and the sequence of their amendments required an interpretation of the good and earned time provisions of part 3 as applying only to the

ing *Mercer v. Theriot,* 377 U.S. 152, 153–54, 84 S.Ct. 1157, 12 L.Ed.2d 206 (1964)).

determination of an inmate's parole eligibility date, which after July 1, 1985, was no longer identical with his mandatory release date. *See Jones,* 799 P.2d at 387; *Thiret,* 792 P.2d at 805; *Bynum,* 784 P.2d at 738–39; *Renneke,* 782 P.2d at 345. In addition, for the reasons we explain below, the statutory language of sections 301 and 302 governing time computations, as to which Ankeney seeks reconstruction, does not govern his sentence in any event.

## B.

¶ 17 Unlike the good time credits allowed by section 17–22.5–301 and the earned time credits allowed by section 17–22.5–302(1), we have arguably never had occasion to separately address the impact on mandatory release, of the so-called "education earned time credits" allowed by section 17–22.5–302(1.5).[9] Subsection 302(1.5) was added to the earned time provision of part 3 in 1988, allowing four days per month extra earned time credit for progress in the corrections literacy program, which was implemented that same year, ch. 119, sec. 2–3, §§ 17–1–103.5, 17–22.5–302(1.5)(a), 1988 Colo. Sess. Laws 696, 696–97; and the entire subsection was amended only two years later to allow those additional earned time credits for progress in the correctional education program, implemented in 1990, ch. 125, sec. 3, § 17–22.5–302(1.5)(a), 1990 Colo. Sess. Laws 971, 976, both programs being included by specific reference in the earned time provision of part 4, *see* § 17–22.5–405(1)(g).[10] The following year, in place of these extra four days of earned time credit, subsection 302(1.5) was amended to simply provide that an inmate making progress in the correctional education program "shall receive earned time pursuant to section 17–22.5–405." Ch. 80, sec. 9, § 17–22.5–302(1.5)(a), 1991 Colo. Sess. Laws 428, 431. Because the earned time granted pursuant to section 17–22.5–405 was already applied by the department against Ankeney's mandatory release date,[11] his claim is limited to the question whether section 302 required that he receive additional credit for progressing in the correctional education program and whether any such credit, granted pursuant to section 302, should similarly have been applied against his mandatory release date. Whatever may be the impact of section 302(1.5) on inmates subject to the time computation provisions of part 3, Ankeney cannot fall within that category.

¶ 18 Part 4 of article 22.5 became effective on June 7, 1990. By its own terms, it was made applicable to all those offenders whose crimes were committed on or after July 1, 1979, except those expressly excluded. § 17–22.5–406. Among other express exclusions, *see, e.g.,* § 17–22.5–406(1)(e) (excluding inmates incarcerated prior to June 7, 1990 who had not accrued any earned time prior to

9. Confusingly, Ankeney's amended petition states that he is entitled to "educational earned time credits" in an amount equal to the maximum number of earned time credits authorized under subsection 302(1), despite the fact that progress in the correctional education program is not included among the criteria for earned time credits under subsection 302(1), but instead, is listed as a basis for receiving separate credits under subsection 302(1.5). *Compare* § 17–22.5–302(1), C.R.S. (2014), *with* § 17–22.5–302(1.5), C.R.S. (2014). Accordingly, despite Ankeney's apparent reference to subsection 302(1), we interpret his petition as raising a separate claim for credits under subsection 302(1.5), and we will address that section accordingly.

10. The statute providing for the literacy education program has since been repealed. *See* ch. 119, sec. 2, § 17–1–103.5(5), 1988 Colo. Sess. Laws 696, 696 (repealing statute providing for literacy education program effective July 1, 1991). Nonetheless, subsection 406(1)(g) continues to include progress in the literacy education program as potential grounds for an award of earned time under part 4. *See* § 17–22.5–405(1)(g), C.R.S. (2014).

11. In *Meyers v. Price,* relying on case law construing the good time and earned time provisions of part 3, this court stated that the addition of part 4 did not alter the intent of the legislature that good and earned time credits should apply only for the purpose of determining parole eligibility. 842 P.2d 229, 231–32 (Colo.1992) (citing, e.g., *Jones,* 799 P.2d at 387; *Bynum,* 784 P.2d at 739). Whether or not that was a correct interpretation of section 402 at the time, and whether or not subsequent legislative amendments to the scheme indicate a change in that intent, the department clearly interprets the earned and earned release time awardable by section 405 as reducing an inmate's sentence for purposes of his mandatory release date, a proposition clearly not disputed by Ankeney.

such date), subsection (3) of section 406 excludes from the coverage of part 4 "any offender who is presently incarcerated who does not meet the criteria stated in" the preceding subsection. § 17–22.5–406(3). These criteria include such things as certification by the department that the offender has not used controlled substances, except as prescribed, for at least the preceding year. § 17–22.5–406(2). Rather than part 4, any such offender's sentence is instead to be governed "by provisions in existence prior to June 7, 1990." § 17–22.5–406(3).

¶ 19 Part 4 establishes entirely new methodologies for determining parole eligibility and discharge from custody. The new formula for determining the former makes an applicable offender eligible for parole after serving fifty percent of the sentence imposed on him, less any time authorized for earned time granted pursuant to section 405. § 17–22.5–403(1).[12] The new formula for the latter permits discharge from the department only after service of the full sentence imposed upon the inmate, as reduced for most inmates by any earned release time and earned time granted pursuant to section 405.[13] § 17–22.5–402. Section 405 specifies not only the amount of earned time that may be deducted from an inmate's sentence but also the allowable reasons for which earned time may be granted, expressly including making positive progress in the statutorily established literacy corrections program or correctional education program. § 17–22.5–405(1).

¶ 20 Part 4 therefore unambiguously prescribes formulae for the parole eligibility and mandatory discharge of those inmates to whom the part applies, taking into account nothing more than the sentence imposed on them, or a percentage thereof, and the reductions specified in section 405. These formulae do not allow for any reduction of the sentence imposed to account for credits otherwise awardable, including even credits already awarded pursuant to part 3. While disadvantaging inmates by depriving them of credit that had already vested could very well implicate constitutional prohibitions against retrospective legislation, it is clear from the face of the applicable statutory provisions themselves that part 4 was designed to provide inmates already serving sentences at the time of its enactment with equally, if not more, advantageous benefits. With regard to parole eligibility, part 4 automatically reduces the term imposed on an offender to the same extent that he could possibly have been awarded good time credits under part 3.[14] With regard to earned time, the provisions of part 4 provide even greater deductions per month than credits allowable under part 3, and with regard specifically to time served before July 1, 1990, limit those deductions only to an amount equal to the credits actually earned by the inmate pursuant to the applicable provisions in effect prior to July 1, 1990.

¶ 21 In short, parts 3 and 4 prescribe separate and distinct methodologies for determining parole eligibility and discharge

12. Certain categories of inmates must serve a greater percentage of their sentences before becoming parole eligible. *See* §§ 17–22.5–403(2)–(3.5) (providing that certain categories of inmates who have previously been convicted of crimes that would qualify as crimes of violence as defined in section 18–1.3–406, C.R.S. (2014), must serve as much as seventy-five percent of their sentences before becoming parole eligible).

13. In 2012, section 405 was amended to allow an additional award of "achievement earned time" credit to inmates who successfully complete a milestone or phase in various programs or demonstrate exceptional conduct that promotes the safety of persons under the department's supervision. However, unlike earned release time, achievement earned time was not similarly added to section 402, concerning the calculation of an inmate's discharge from custody. We express

no opinion as to the effect of achievement earned time credits on an inmate's sentence.

14. Section 301 authorizes a maximum good time deduction of fifteen days a month, which the department has interpreted to mean that upon serving fifteen days an inmate is entitled to have the remaining fifteen days in the month credited as a good time deduction, in effect a fifty percent deduction. Ankeney disputes this interpretation and instead understands the statute to permit a fifteen-day deduction only after actually serving an entire month, or thirty days, in effect reducing the credit or deduction to thirty-three percent. The fifty percent formula of section 403 therefore corresponds to the long-time department statutory interpretation and practice and would afford inmates an even greater benefit over the pre-existing scheme according to Ankeney's interpretation.

from custody, each applying to a different class of offenders. Because particular provisions of either might govern the release of any particular offender convicted of a crime committed on or after July 1, 1979 and already serving his sentence at the time part 4 was enacted, and because the provisions that will ultimately govern release of such an offender may not even be determinable until that particular inmate approaches his release date pursuant to part 4,[15] the release provisions of both parts were intended to function simultaneously, side by side, and for that reason both have continued to be updated by amendments. In the end, however, part 4 can only be understood to require that an inmate's release be governed by the methodology of one statutory scheme or the other—not a combination of credits or sentence reductions applicable to different release formulae. To the extent that the various applicability provisions of section 303 could be considered to conflict with those of section 406, notwithstanding the circumscribed reach of the former's release provisions expressly mandated by the latter, as the more recent in time, section 406 controls. § 2–4–206, C.R.S. (2014).

¶ 22 Neither party has asserted or offered any construction according to which the release of Ankeney, an offender incarcerated after June 7, 1990 for a crime committed after July 1, 1979, was not governed by part 4. Quite the contrary, Ankeney's theory of immediate release is contingent upon his sentence having been reduced according to section 402. By the same token, there is no suggestion that less than all of the earned time permitted by section 405, which includes credit for positive progress in the literacy corrections program or the correctional education program, was applied against Ankeney's discharge date. However much, and to whatever effect, education earned time may be awarded pursuant to section 302(1.5) to an offender whose release is not governed by part 4, it clearly could not, therefore, have been awarded to Ankeney or further reduced his sentence in accordance with the formula of section 402.

15. Such contingencies concerning applicability provide some explanation for the department's failure to draw any clean distinction between the

## III.

¶ 23 Because the lower courts erroneously concluded that for inmates convicted of crimes committed after July 1, 1993, good time credits awardable by section 17–22.5–301 are to be applied against an inmate's mandatory release date rather than merely to determine his parole eligibility; and because a proper application of the statutory deductions from his sentence to which Ankeney is entitled demonstrates that he has not completed service of his required term of parole, the judgment of the district court is reversed.

good time credits of section 301 and the corresponding fifty percent reduction of section 403 in explaining its time computations.