2015 CO 42

The PEOPLE of the State of Colorado, Petitioner

v.

Michael Quinn TATE, Respondent.

Tenarro Banks, Petitioner

v.

The People of the State of Colorado, Respondent.

Erik Brendan Jensen, Petitioner

v.

The People of the State of Colorado, Respondent.

Supreme Court Case No. 12SC932, Supreme Court Case No. 12SC1022, Supreme Court Case No. 13SC211

Supreme Court of Colorado.

June 1, 2015

Rehearing Denied July 13, 2015

Rehearing Denied August 3, 2015

C.A.R. 50 Certiorari to the Colorado Court of Appeals, Court of Appeals Case No. 12CA634, Douglas County District Court Case No. 98CR422, Honorable Richard Caschette, Judge

Attorneys for Petitioner The People of the State of Colorado: Cynthia H. Coffman, Attorney General, Elizabeth Rohrbough, Senior

Assistant Attorney General, Denver, Colorado

Attorneys for Petitioner Tenarro Banks: Samler & Whitson, P.C., Eric A. Samler, Denver, Colorado

Attorney for Petitioner Erik Brendan Jensen: Alison Ruttenberg, Boulder, Colorado

Attorneys for Respondent Michael Quinn Tate: Lord Law Firm, LLC, Kathleen A. Lord, Denver, Colorado

Attorneys for Respondent The People of the State of Colorado: Cynthia H. Coffman, Attorney General, Elizabeth Rohrbough, Senior Assistant Attorney General, Denver, Colorado

Attorneys for Amici Curiae Colorado Juvenile Defender Coalition, Colorado Criminal Defense Bar, Office of the Colorado State Public Defender, National Partnership for Juvenile Services, International Community Corrections Association, and American Probation and Parole Association: Colorado Juvenile Defender Coalition, Elizabeth C. Logemann, Denver, Colorado

Attorneys for Amicus Curiae Juvenile Law Center: Juvenile Law Center, Marsha Levick, Philadelphia, Pennsylvania, Samler & Whitson, P.C., Eric A. Samler, Denver, Colorado

JUSTICE EID delivered the Opinion of the Court.

¶ 1 We granted review in two cases to determine what remedy is appropriate for juvenile defendants who were given sentences that would be unconstitutional under the Supreme Court's decision in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012). We granted review in a third case to determine whether that remedy applies retroactively.

¶ 2 The first two cases come to us on direct appeal. Both defendants in those cases, Tenarro Banks and Michael Quinn Tate, were convicted in 2004 of class 1 felonies for acts committed when they were juveniles. Tate was convicted of felony murder for the stabbing death of a friend's father during a burglary when Tate was sixteen. *People v.*

*Tate*, No. 07CA2467, 2012 WL 4010238 (Colo. App. Sept. 13, 2012). Banks was convicted of first degree murder for shooting another teenager outside of a house party when he was fifteen. *People v. Banks*, 2012 COA 157, —— P.3d ——.

¶ 3 Under the sentencing scheme in place at the time, which governed offenses committed between 1990 and 2006, both Banks and Tate were given mandatory sentences to life in prison without the possibility of parole ("LWOP"). While both cases were pending on appeal to the court of appeals, the Supreme Court released its opinion in *Miller*.

¶ 4 *Miller* holds that it violates the Eighth Amendment's prohibition on cruel and unusual punishment to give a juvenile a mandatory LWOP sentence. *Miller*, —— U.S. at ——, 132 S.Ct. at 2460. While *Miller* did not categorically bar LWOP sentences for juveniles in all circumstances, it held that LWOP could not be imposed on a mandatory basis, and instead could be imposed only after an individualized sentencing process that takes into account the defendant's "youth and attendant characteristics." *Id.* at ——, 132 S.Ct. at 2471. The *Miller* decision renders the Colorado statutory scheme for mandatory LWOP in place between 1990 and 2006 unconstitutional as applied to juveniles, including Tate and Banks.

¶ 5 The question, then, becomes one of remedy. The legislature has not acted to adopt a new sentencing scheme in light of *Miller*. We therefore are presented with the situation in which the only sentence adopted by the legislature–LWOP–cannot be applied to the cases before us on direct appeal.

¶ 6 In order to fill this gap, we take guidance from the U.S. Supreme Court, which cautions that we should "try not to nullify more of a legislature's work than is necessary." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006); *see also Dallman v. Ritter*, 225 P.3d 610, 638 (Colo.2010) ("[W]e strike as little of the law as possible....."). Because *Miller* dictates that a juvenile cannot be sentenced to LWOP unless there is an individualized consideration of the defendant's "youth and attendant char-

acteristics," we conclude that the proper remedy in these two cases, in the absence of legislative action, is to remand for such a determination. A hearing on whether a LWOP sentence is appropriate considering the defendant's "youth and attendant characteristics" is the remedy that preserves as much of the legislature's work as possible given *Miller*'s holding.

¶ 7 If the trial court should determine, after an individualized sentencing process, that LWOP is not warranted, the appropriate sentence, again in the absence of legislative action, is life in prison with the possibility of parole after forty years ("LWPP"). This is the sentence that was in place both before and after the mandatory LWOP scheme at issue in this case—that is, before 1990 and after 2006. We conclude that LWPP is the sentence that the legislature would have imposed had it known that LWOP could be imposed under *Miller* only after individualized sentencing, and that such individualized sentencing could lead to cases in which LWOP is unwarranted. We therefore find that this is the remedy that the "the General Assembly would have intended in light of our constitutional holding." *People v. Montour*, 157 P.3d 489, 502 (Colo.2007).

¶ 8 Accordingly, we affirm the panel's decision in *Tate* to remand the case to determine whether LWOP is an appropriate sentence under *Miller*, but reverse its decision to decline to give guidance as to the appropriate sentence if LWOP is unwarranted. We hold that if the trial court determines LWOP is not warranted, LWPP is the proper sentence. In *Banks*, we reverse the panel's decision to the extent that it imposed a LWPP sentence without a remand to consider whether LWOP is appropriate considering the defendant's "youth and attendant characteristics" under *Miller*, but affirm the decision to the extent that it imposes LWPP after the *Miller* determination. We remand both cases for further proceedings consistent with this opinion.

¶ 9 The third case before us comes on collateral review, thus requiring us to consider whether the *Miller* remedy described above should be applied retroactively. Eric Brendan Jensen was convicted in 1998 of first degree murder for helping a friend kill the friend's mother and dispose of the body. He committed this crime when he was seventeen. Under the sentencing scheme in place at the time, described above, Jensen was given a mandatory sentence to LWOP. On direct appeal, the court of appeals affirmed the judgment. *People v. Jensen*, 55 P.3d 135, 141 (Colo.App.2001). This court denied Jensen's certiorari petition, and the judgment became final. Jensen later filed two Crim. P. 35(c) motions for post-conviction relief, the second of which is at issue here. The trial court denied the motion, and Jensen appealed to the court of appeals. While that appeal was pending, the Supreme Court released *Miller*. Jensen filed a C.A.R. 50 petition with this court, asking us to review his sentence in light of *Miller*. We granted the petition for review.

¶ 10 We hold that the new rule announced in *Miller* is procedural, rather than substantive, in nature, and that therefore it does not apply retroactively. *See Schriro v. Summerlin*, 542 U.S. 348, 351–53, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (holding that procedural new rules are not applied retroactively). As the Supreme Court stated in *Miller*, "Our decision does not categorically bar a penalty for a class of offenders or type of crime.... Instead, it *mandates only that a sentencer follow a certain* process–considering an offender's youth and attendant characteristics–before *imposing a particular penalty*." —— U.S. at ——, 132 S.Ct. at 2471 (emphasis added). Because the *Miller* rule does not apply retroactively to cases on collateral review of a final judgment, it does not apply to Jensen. We therefore affirm the trial court's order denying his motion for post-conviction relief.

## I.

### A.

¶ 11 We begin by addressing the facts and procedural posture that apply to Tate and Banks. We then turn to Jensen.

¶ 12 In 2004, Tate was convicted of felony murder for the stabbing death of a friend's father during a burglary. Tate was sixteen at the time of the crime. The trial court

sentenced him to LWOP, because it was the statutorily-mandated sentence for crimes committed between 1990 and 2006. While his appeal was pending before the court of appeals, the Supreme Court released *Miller*.

¶ 13 On direct appeal, the court of appeals affirmed Tate's conviction in an unpublished opinion. *Tate*, No. 07CA2467. It also found that under *Miller*, Tate's LWOP sentence was unconstitutional because he did not receive an individualized sentence before being given LWOP. *Tate*, slip op. at 25. The court did not, however, invalidate any part of the statutory scheme. *See id.*, slip op. at 21. Instead, it vacated the sentence and remanded the case for individualized resentencing to determine whether LWOP was warranted. *Id.*, slip op. at 25. It also stated that if the trial court concluded on remand that LWOP was not warranted, "the parties are not restricted by this opinion in arguing for or against any other prison or parole terms." *Id.*, slip op. at 26. The appellate court thus did not opine on what the trial court should do if it concludes that LWOP is not warranted under the circumstances. Finally, the court of appeals rejected the Attorney General's suggestion that Tate's sentence need not be vacated, but instead that he be given LWPP automatically. The court reasoned that such a remedy "goes further than *Miller* requires." *Id.*, slip op. at 23.

¶ 14 The People petitioned this court for review, arguing that Tate's sentence need not be vacated, but instead that he be given a sentence of LWPP by applying either the doctrine of revival or severance to the sentencing statutes. This court granted the People's petition for review.[1]

¶ 15 In 2004, the trial court convicted Banks of first degree murder for the shooting death of a rival gang member outside of a house party. Banks was fifteen at the time of the crime. The trial court sentenced him to LWOP, because it was the statutorily-mandated sentence for crimes committed between 1990 and 2006. While his appeal was pending before the court of appeals, the Supreme Court released *Miller*.

¶ 16 On direct appeal, the court of appeals affirmed Banks's conviction. It also found that under *Miller*, Banks's LWOP sentence was unconstitutional. The court's remedy, however, differed from the remedy in *Tate*. Relying on Colorado's general severability clause in section 2–4–204, C.R.S. (2014), the panel "restrict[ed] the applicability" of the offending portions of the statutes "to adult offenders." *People v. Banks*, 2012 COA 157, ¶ 127, —— P.3d ——. Reasoning that the General Assembly intended to give juvenile class 1 offenders the most serious sentence possible, and that LWPP was the most serious sentence available in the statutes, the court vacated the sentence to the extent it denied Banks parole, and gave instructions to automatically sentence him to LWPP. *Banks*, ¶ 128–31. In essence, the court of appeals in *Banks* adopted the remedy proposed by the Attorney General in *Tate*.

¶ 17 Banks petitioned this court for review, arguing that the LWPP sentence was still unconstitutional under *Miller* because it was given mandatorily without individualized sentencing, and that the court of appeals exceeded its authority in its use of severability to arrive at the LWPP sentence. This court granted Banks's petition for review.[2]

---

1. The question upon which we granted certiorari is the following:

   Whether, after *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), invalidated mandatory life without parole for juveniles, the court of appeals erred by remanding the defendant's case for resentencing instead of upholding the defendant's life sentence and remanding the case to reflect that the defendant will be eligible for parole after forty calendar years.

2. The questions upon which we granted certiorari are the following:

1. Whether, after *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the Eighth Amendment to the U.S. Constitution is violated by the imposition on a juvenile of a sentence of mandatory life sentence with potential for parole after forty years.
2. Whether the court of appeals exceeded its judicial authority by rewriting the criminal sentence statutes in a way not authorized or compelled by Colorado statutes or sound "severability" analysis.

¶ 18 Because the legislature has not acted to adopt a new sentencing scheme in light of *Miller,* we are confronted with the situation in which the only sentence adopted by the legislature–LWOP–cannot be applied to Tate and Banks. When presented with such a situation, the Supreme Court cautions that we should "try not to nullify more of a legislature's work than is necessary." *Ayotte,* 546 U.S. at 329, 126 S.Ct. 961; *see also Dallman,* 225 P.3d at 638 ("[W]e strike as little of the law as possible....."). Because *Miller* dictates that a juvenile cannot be sentenced to LWOP unless there is an individualized consideration of the defendant's "youth and attendant characteristics," we conclude that the proper remedy in these cases, in the absence of legislative action, is to remand for such a determination. Such a remedy preserves as much of the legislature's work as possible given *Miller*'s holding.

¶ 19 If, after performing an individualized sentencing process, the trial court should determine that LWOP is not warranted, the appropriate sentence, again in the absence of legislative action, is life in prison with the possibility of parole after forty years. This sentence was in place both before and after the mandatory LWOP scheme at issue in this case–that is, before 1990 and after 2006. We conclude that LWPP is the sentence that the legislature would have imposed had it known that LWOP could be imposed under *Miller* only after individualized sentencing, and that such individualized sentencing could lead to cases in which LWOP is unwarranted. *See Montour,* 157 P.3d at 502 (adopting the remedy that "the General Assembly would have intended in light of our constitutional holding.").

¶ 20 We thus affirm the *Tate* panel to the extent that it concluded that the proper remedy was a remand for individual consideration of the defendant's "youth and attendant characteristics" to determine whether LWOP is the appropriate sentence. The *Tate* panel took no position, however, on what sentence would be appropriate if LWOP is determined to be unwarranted. We reverse this portion of the decision and hold that, again in the absence of legislative action, if the trial court determines LWOP is not warranted after considering the defendant's "youth and attendant characteristics," the proper sentence is LWPP.

¶ 21 In *Banks,* we reverse the panel's decision to the extent that it did not remand the case for determination of whether LWPP is warranted under *Miller,* but affirm the decision to the extent that it imposes LWPP after the *Miller* determination. We remand both *Tate* and *Banks* for further proceedings consistent with this opinion.

**B.**

¶ 22 In 1998, the trial court convicted Jensen of first degree murder for helping a friend kill the friend's mother and dispose of the body. Jensen was seventeen at the time of the crime. The trial court sentenced him to LWOP, because it was the statutorily-mandated sentence for such crimes committed between 1990 and 2006. On direct appeal, the court of appeals affirmed the conviction. *Jensen,* 55 P.3d at 141. This court denied Jensen's petition for certiorari, and the judgment became final.

¶ 23 Jensen later filed a collateral Crim. P. 35(c) motion for post-conviction relief which alleged ineffective assistance of counsel. The trial court denied the motion. Jensen appealed, and the court of appeals affirmed the trial court's decision. *People v. Jensen,* No. 05CA0864, 2007 WL 689483 (Colo.App. Mar. 8, 2007). Once again, this court denied Jensen's petition for certiorari.

¶ 24 Several years later, the Supreme Court released *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Jensen filed another post-conviction motion which argued that *Graham* rendered his sentence unconstitutional. The trial court denied the motion. Jensen appealed to the court of appeals. While that appeal was pending, the Supreme Court released *Miller.* Jensen then filed a C.A.R. 50 petition which asked this court to grant review in order to analyze the constitutionality of his sentence under *Miller.* This court granted his C.A.R. 50 petition,[3] and stayed his petition before the court of appeals.

---

**3.** The question upon which we granted certiorari    is the following:

¶ 25 The question presented is whether *Miller* should be applied retroactively to cases such as Jensen's on collateral review of a final judgment.[4] We hold that *Miller* is not retroactive. Generally, new procedural rules are not applied retroactively. *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519. The *Miller* rule is procedural, rather than substantive, because it does not bar the imposition of a LWOP sentence on a juvenile, but rather requires that a "certain process" be followed before a juvenile may be sentenced to LWOP. *Miller*, —— U.S. at ——, 132 S.Ct. at 2471. Because the new rule announced in *Miller* is procedural in nature, it does not apply to cases on collateral review of a final judgment such as Jensen's. Accordingly, we affirm the trial court's order denying Jensen post-conviction relief.

## II.

¶ 26 *Tate* and *Banks* involve the application of *Miller* to Colorado's sentencing scheme as it existed from 1990 to 2006. It is therefore necessary to discuss both the *Miller* opinion and Colorado's statutory scheme in some detail.

¶ 27 In *Miller*, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, —— U.S. at ——, 132 S.Ct. at 2469. The Court's analysis started with its understanding that the "central" principle of the Eighth Amendment's ban on cruel and unusual punishment is proportionality. *Id.* at ——, 132 S.Ct. at 2463. The Court traced this proportionality principle through two strands of precedent, and found that both strands coalesced in the case before it. *Id.*

¶ 28 The first strand involves categorical bans on specific punishments for specific classes of offenders–for instance, barring a sentence of life without the possibility of parole for juveniles who commit nonhomicide offenses, *Graham*, 560 U.S. at 74, 130 S.Ct. 2011, or barring the death penalty for juveniles, *Roper v. Simmons*, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). This strand applies to juveniles because they are different from adults in their "diminished culpability and greater prospects for reform." *Miller*, —— U.S. at ——, 132 S.Ct. at 2464. As a class, they are therefore "less deserving of the most severe punishments." *Id.* (quoting *Graham*, 560 U.S. at 68, 130 S.Ct. 2011.).

¶ 29 The second strand prohibits the mandatory imposition of the death penalty. *Id.* at ——, 132 S.Ct. at 2463. Those cases require an individualized sentencing process, where the sentencer must "consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at —— – ——, 132 S.Ct. at 2463–64. *Miller* found that this strand applies to juveniles with LWOP because, as with the death penalty, "[i]mprisoning an offender until he dies alters the remainder of his life 'by a forfeiture that is irrevocable.' " *Id.* at ——, 132 S.Ct. at 2466 (quoting *Solem v. Helm*, 463 U.S. 277, 300–01, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)).

¶ 30 These two strands converge on mandatory LWOP for juveniles. Because juveniles as a class are less culpable and have greater prospects for reform, the sentencer must first "take into account how children are different, and how those differences counsel against irrevocably sentencing

Whether the district court's determination that petitioner's life without parole sentence was unconstitutional under the Eighth Amendment and Art. II, section 20, Colo. Const., because he was a juvenile when the crime was committed, and, assuming the sentence is invalid, what is the appropriate remedy.

4. The Attorney General has conceded that *Miller* applies retroactively to Jensen. This concession, however, is not binding on this court. *People in Interest of P.J.N.*, 664 P.2d 245 (Colo.1983) (holding that a specific precedent does not control the

result, despite the fact that both parties conceded that it did); *Denver & R.G.R. Co. v. Johnson*, 50 Colo. 187, 114 P. 650, 651 (1911) ("The fact that opposing counsel may agree upon a proposition of law, does not commit the court to its approval."). The District Attorney is not bound by the concession either. *See People v. Vigil*, 2015 CO 43 ¶ 1, —— P.3d —— (Colo.2015) (noting that the District Attorney in that case argues that *Miller* does not apply retroactively). We therefore proceed to consider the *Miller* retroactivity question on the merits.

them to a lifetime in prison." *Id.* at ——, 132 S.Ct. at 2469.

¶ 31 Although *Miller* thought that appropriate occasions for giving LWOP to juveniles will be "uncommon" and "rare," it did not foreclose that sentence entirely. *Id.* As the Court stated, "Our decision does not categorically bar a penalty for a class of offenders or type of crime–as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process–considering an offender's youth and attendant characteristics–before imposing a particular penalty." *Id.* at ——, 132 S.Ct. at 2471. In sum, *Miller* requires that a sentencer take into account "an offender's youth and attendant characteristics" before sentencing a juvenile to LWOP. *Id.* at ——, 132 S.Ct. at 2471.

¶ 32 Turning to Colorado's statutory scheme, from 1985 until 1990, a "life sentence" meant life with the possibility of parole after forty years. § 18–1–105(4)(a), C.R.S. (1985) ("As to any person sentenced for a class 1 felony, for an act committed on or after July 1, 1985, life imprisonment shall mean imprisonment without the possibility of parole for forty calendar years."); § 17–22.5–104(2)(c), C.R.S. (1985) ("No inmate imprisoned under a life sentence for a crime committed on or after July 1, 1985, shall be paroled until he has served at least forty calendar years ....") (hereinafter "1985 provision"). This definition did not differentiate between adults and juveniles.

¶ 33 In 1990, the legislature changed the definition of a life sentence to mean life without the possibility of parole. This is the version of the statutes under which Tate and Banks were sentenced.[5] In making this change, however, the legislature did not remove the 1985 provision. Instead, it added language stating that the new definition would apply to all crimes committed on or after July 1, 1990. § 18–1–105(4)(a), C.R.S. (1990) ("As to any person sentenced for a class 1 felony, for an act committed on or after July 1, 1990, life imprisonment shall mean imprisonment without the possibility of parole."); § 17–22.5–104(2)(d), C.R.S. (1990) ("No inmate imprisoned under a life sentence

for a crime committed on or after July 1, 1990, shall be eligible for parole.") (hereinafter "1990 provision"). Again, this definition did not differentiate between adults and juveniles.

¶ 34 In 2006, the legislature made another change. Once again, it kept the 1985 provision and the 1990 provision substantively the same. But it added additional language stating that for juveniles convicted of crimes committed on or after July 1, 2006, a life sentence once again meant being eligible for parole after forty years. § 18–1.3–401(4)(b)(I), C.R.S. (2014) ("[A]s to a person who is convicted as an adult of a class 1 felony following direct filing of an information ... the district court judge shall sentence the person to a term of life imprisonment with the possibility of parole after serving a period of forty calendar years."); § 17–22.5–104(2)(d)(IV), C.R.S. (2014) ("[A]n inmate imprisoned under a life sentence for a class 1 felony committed on or after July 1, 2006, who was convicted as an adult following direct filing of an information ... may be eligible for parole after the inmate has served at least forty calendar years.") (hereinafter "2006 provision"). Essentially, the legislature went back to the 1985 definition of a life sentence, but only for juveniles.

¶ 35 *Miller* holds that it violates the Eighth Amendment's prohibition on cruel and unusual punishment to give a juvenile a mandatory LWOP sentence. *Miller*, —— U.S. at ——, 132 S.Ct. at 2460. Thus, *Miller* renders Colorado's mandatory LWOP unconstitutional as applied to juvenile defendants. There is no question that the mandatory LWOP sentences given to Tate and Banks are unconstitutional. In the absence of action by the General Assembly, we must determine what a constitutional sentence would be–that is, what is the appropriate remedy.

¶ 36 We return again to *Miller*, which held that a LWOP sentence could be imposed only after considering a defendant's "youth and attendant characteristics." Given *Miller's* command, we conclude that the appropriate remedy in these cases is to vacate the LWOP sentences and remand for the trial court to

---

**5.** Jensen was also sentenced under this scheme.

determine whether a LWOP sentence is appropriate given the defendants' "youth and attendant characteristics."

¶ 37 In *Tate*, the People contend that it is unnecessary to vacate a LWOP sentence and remand, and instead argue that a LWPP sentence should be imposed in lieu of a remand. We disagree on the ground that, as noted above, *Miller* holds that LWOP may be imposed after considering the defendant's "youth and attendant characteristics." We thus echo the panel's observation in *Tate* that the People's proposed remedy "goes further than *Miller* requires." *Tate*, slip op. at 23. We take guidance from the Supreme Court, which cautions that we should "try not to nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329, 126 S.Ct. 961; *see also Dallman*, 225 P.3d at 638 ("[W]e strike as little of the law as possible....."). We thus affirm the *Tate* panel with respect to the *Miller* remand, and reverse *Banks* to the extent that it does not require a *Miller* remand.

¶ 38 The imposition of a LWOP sentence, again as *Miller* contemplates, should be "uncommon" and "rare." Thus we go on to consider what sentence should be imposed if, after considering a defendant's "youth and attendant characteristics," LWOP is not warranted. Accordingly, we reverse the *Tate* panel's decision not to opine on what the appropriate remedy would be if the trial court concludes that LWOP is inappropriate. *Tate*, slip op. at 26.

¶ 39 Here, we agree with the People and the *Banks* panel that a LWPP would be the appropriate sentence, and affirm *Banks* to the extent that it imposes LWPP after the *Miller* determination. We disagree, however, with the panel's reasoning. Both the People and the *Banks* panel suggest that LWPP should be imposed under a severance theory, while Banks argues that the panel improperly invoked severance. In addition, the People make the alternative argument that a revival theory would work as well. Because of the nature of these statutory provisions, however, we conclude that neither severance nor revival is applicable.

¶ 40 The *Banks* panel purported to bring Colorado's statutory scheme in line with *Miller* using severance by "restricting the applicability of the last sentence of section 18–1.3–401(4)(a) and the first sentence of section 17–22.5–104(2)(d)(I) to adult offenders." *Banks*, ¶ 127. Because the sentencing scheme in this case lacks a specific severability clause, however, any power to sever would derive from the general severability clause in section 2–4–204. *See High Gear and Toke Shop v. Beacom*, 689 P.2d 624, 633 n. 10 (Colo. 1984). The general severability clause states that if a provision of a statute is found unconstitutional, the remainder of the statute is "valid, unless it appears to the court that the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one." § 2–4–204. These statutory terms preclude the use of severance in this case for several reasons.

¶ 41 First, the People urge us to "limit the application" of certain phrases to adults, but do not actually suggest that we remove language from the statute. But severance involves removing language from the statute—or as section 2–4–204 explains, the offending passage becomes "void." Our case law assumes that severance means striking language from a statute. *See, e.g., Rodriguez v. Schutt*, 914 P.2d 921, 929 (Colo.1996) ("We may *sever* and *strike* any portion of a statute which we hold to be unconstitutional ....") (emphasis added); *Montour*, 157 P.3d at 502 ("[T]he General Assembly would have been satisfied with the portions of a statute that remain after the unconstitutional portions are *stricken.*") (emphasis added); *Dallman*, 225 P.3d at 638 ("[W]e *strike* as little of the law as possible ....") (emphasis added). Only "severing" the statute for juveniles, therefore, is not a valid use of severance. We echo the *Tate* panel in noting that "the Attorney General cites no case, nor have we found one, where section 2–4–204 has been used to engraft exception language into a statute." *Tate*, slip op. at 22.

¶ 42 Furthermore, if we were to strike the offending statutory language, we would do

damage to the statutory scheme. Because the statutes do not differentiate between juveniles and adults, severing anything would mean changing the application of the statute to adults as well.

¶ 43 Finally, and fundamentally, severance is not appropriate because the scheme has not been declared facially unconstitutional. Instead, it is unconstitutional under *Miller* as applied to juveniles. This fact precludes applying section 2–4–204, which allows the court to remove portions from a statute which are found to be "unconstitutional." Because the statutes here are not constitutionally void, they are not candidates for severance. *See, e.g., Bd. of Cnty. Comm'rs v. Vail Assocs.*, 19 P.3d 1263, 1280 (Colo.2001), *as modified on denial of reh'g* (Mar. 19, 2001) ("[W]e sever any provision that we hold to be unconstitutional from those provisions that stand...."); *Rodriguez*, 914 P.2d at 929 ("We may sever and strike any portion of a statute which we hold to be unconstitutional....").[6]

■ ¶ 44 As an alternative, the People urge this court to apply the revival doctrine to arrive at an LWPP sentence. Here, that would mean applying the 1985 statutory scheme instead of the 1990 scheme. This is not a viable option either.

■ ¶ 45 Revival is a doctrine which "generally operates to reactivate a prior statute which has been replaced by an invalid act." *People v. District Court*, 834 P.2d 181, 189 (Colo.1992). In *White v. District Court*, 503 P.2d 340, 341 (Colo.1972), this Court gave three considerations for concluding that revival was appropriate in that case: (1) the newer law had completely replaced the older law; (2) if the newer law were declared unconstitutional, there would be a void in the

law if the older law stayed repealed; and (3) the legislature would have intended the older law to be revived if it could have known the newer law would be declared unconstitutional. In this case, there are problems with each of these three considerations.

¶ 46 First, the 1990 provision did not replace the 1985 provision, but merely added to the statutes. *See* § 17–22.5–104(2)(c)–(d); § 18–1.3–401(4)(a). Second, the 1990 provision has not been declared facially unconstitutional: as noted above, it is unconstitutional as applied to juveniles. Third, it is implausible that the legislature would intend to have its newer statute be replaced by an older statute when the newer statute has. not been declared unconstitutional. Revival, therefore, is not an option here.

■ ¶ 47 Although we reject the application of severance and revival doctrines, we conclude that LWPP is the appropriate sentence if LWOP is deemed unwarranted because it is the sentence that best reflects legislative intent. The basic principle underlying our severance and revival jurisprudence is that the intent of the legislature should be our guide. *See, e.g., Rodriguez*, 914 P.2d at 929 ("The intent of the General Assembly aids our determination of the propriety of severing statutory language."); *District Court*, 834 P.2d at 189 ("To determine whether to apply the revival doctrine, the test of legislative intent was invoked...."). We acknowledge that no direct legislative intent exists to guide the determination here, because the only sentence adopted by the legislature–mandatory LWOP–is unconstitutional. There are, however, still principles we can turn to for guidance. In examining this legislative intent, we must strive to keep as much of the legislature's work intact as possible, as a "ruling of unconstitutionality frus-

---

6. The fact that the statutes are not unconstitutionally void also precludes an alternate theory of severance, namely, one that would remove the temporal restrictions in section 18–1.3–401(4)(b)(II), C.R.S. (2014), and section 17–22.5–104(2)(d). Because no one has claimed the temporal restrictions are constitutionally void, severance is not applicable to them. Additionally, striking the temporal restrictions would violate our goal of "limit[ing] the solution to the problem." *Ayotte*, 546 U.S. at 321, 126 S.Ct. 961. The problem with the 1990 statutory scheme is

not that it sentences juveniles to LWOP. The problem is that it sentences them to LWOP without individualized sentencing that takes their youth into account. *See Miller*, —— U.S. at ——, 132 S.Ct. at 2471. Striking the temporal restrictions from these statutes would eliminate the possibility of this individualized sentencing, which goes beyond the immediate problem and "nullif[ies] more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 321, 126 S.Ct. 961.

trates the intent of the elected representatives of the people." *Ayotte*, 546 U.S. at 329, 126 S.Ct. 961 (citing *Regan v. Time, Inc.*, 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion)); *Dallman*, 225 P.3d at 638 ("[W]e strike as little of the law as possible...."). The core consideration of legislative intent is determining what the enacting legislature would have done if it had known that this eventuality would happen. *United States v. Booker*, 543 U.S. 220, 246, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ("We seek to determine what Congress would have intended in light of the Court's constitutional holding.") (internal citations omitted); *Montour*, 157 P.3d at 502. ("We seek to determine what the General Assembly would have intended in light of our constitutional holding."). We thus ask what the legislature would have imposed had it known that LWOP could be imposed under *Miller* only after individualized sentencing, and that such individualized sentencing would lead to cases in which LWOP is unwarranted.

¶ 48 We hold that that sentence would be LWPP. LWPP was the sentence in place prior to the 1990 provision. *See* § 18–1–105(4)(a), C.R.S. (1985). It is also the sentence imposed upon juveniles since 2006. *See* § 18–1.3–401(4)(b)(I)–(II). Because LWPP was the sentence chosen by the legislature both before and after the period at issue in these cases, it is likely in keeping with legislative intent.

¶ 49 We note that, as a general principle, looking to the subsequent actions of the legislature is not an ideal method of determining legislative intent. *See, e.g., United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962) ("[S]tatutes are construed by the courts with reference to the circumstances existing at the time of the passage."). This situation, however, is unique, in that *Miller* dictates that Colorado's mandatory LWOP sentencing scheme cannot be applied to juveniles such as Tate and Banks. Given the limitations of this unique situation, looking to the statutory scheme in place before and after the mandatory LWOP provision is our best indication of legislative intent in this case.

¶ 50 As a final matter, we turn to the primary argument made by Banks–namely, that LWPP is unconstitutional under *Miller* because, like LWOP, it is mandatory in nature. *Miller* expressly addressed the imposition of "mandatory life without parole for those under the age of 18 at the time of their crimes." *Miller*, —— U.S. at ——, 132 S.Ct. at 2460. It did not suggest that LWPP would be similarly unconstitutional as applied to juveniles. Banks thus reads *Miller* too broadly. Because *Miller* does not go so far as to declare LWPP unconstitutional as applied to juveniles, we find that it is not only the appropriate sentence but also a constitutional one if LWOP is determined to be unwarranted under *Miller*.

¶ 51 In sum, we hold that the proper remedy after *Miller* is to vacate a defendant's LWOP and to remand the case to the trial court to consider whether LWOP is an appropriate sentence given the defendant's "youth and attendant characteristics." If the trial court concludes that LWOP is unwarranted, LWPP is the appropriate sentence. We therefore vacate the LWOP sentences imposed upon Tate and Banks and remand the cases for consideration of whether LWOP is appropriate considering their "youth and attendant characteristics." If not, LWPP should be imposed.

### III.

¶ 52 Jensen was sentenced to LWOP under the scheme described above, but in contrast to Tate and Banks, his conviction is final and is before this court on collateral review. We must therefore decide whether *Miller* applies retroactively. As we have observed, "limiting the retroactive application of constitutional rules .... is vital to effectuating finality, which is an essential component of the criminal justice system." *Edwards v. People*, 129 P.3d 977, 987 (Colo. 2006).

¶ 53 In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), the Supreme Court set forth the analysis for considering whether a new rule of criminal procedure should apply retroactively to a case which has already become final. States are not required to adopt *Teag-*

*ue* for their retroactivity determinations. *Danforth v. Minnesota*, 552 U.S. 264, 266, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).[7] However, this court has chosen to adopt *Teague* as its test for applying new rules retroactively. *Edwards*, 129 P.3d at 983.

¶ 54 Under *Teague*, the first step of the analysis is to determine whether a conviction is final. *Edwards*, 129 P.3d at 983. Here, there is no question that Jensen's conviction is final and comes before us on collateral review.

▮▮▮ ¶ 55 Second, the question is whether *Miller* announced a "new rule." *Id.* Generally, a new rule is not retroactively applicable to cases that have become final before its announcement. *Teague*, 489 U.S. at 310, 109 S.Ct. 1060. A case announces a new rule when it "breaks new ground or imposes a new obligation on the States or the Federal Government." *Id.* at 301, 109 S.Ct. 1060. We conclude that *Miller* "broke new ground" and "imposed a new obligation on states" by holding that states could not sentence a juvenile defendant to LWOP without first considering the juvenile's "youth and attendant characteristics." *Miller*, 132 S.Ct. at 2471.

▮▮▮ ¶ 56 Third, if the rule is found to be new, as in this case, the issue is whether it "meets either of the two *Teague* exceptions to the general bar on retroactivity." *Edwards*, 129 P.3d at 983. The first of these exceptions is a "watershed rule"—that is, one "without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 985 (internal quotation marks and citations omitted). This definition of a watershed rule is "extremely narrow." *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519. In fact, the Supreme Court has given only one example of such a watershed rule: *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Edwards*, 129 P.3d at 979. Jensen offers

nothing to support his assertion that *Miller* announces a watershed rule, nor do we find any such support. Instead, we conclude that the "extremely narrow" watershed exception does not apply here because *Miller* does not involve the accuracy of conviction at all, but rather sentencing.

▮▮▮ ¶ 57 The second exception to the general rule of nonretroactivity is where a new rule of criminal procedure is substantive in nature. *Schriro*, 542 U.S. at 351, 124 S.Ct. 2519. A new rule is substantive if it "alters the range of conduct or the class of persons that the law punishes." *Id.* at 353, 124 S.Ct. 2519. By contrast, a rule is procedural when it regulates "the manner of determining the defendant's culpability." *Id.*

¶ 58 This distinction between procedural and substantive rules is well illustrated by *Schriro*. There, the Court determined that the new rule announced in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), would not apply retroactively. *Schriro*, 542 U.S. at 358, 124 S.Ct. 2519. *Ring* ruled that aggravating factors needed for a death penalty sentence must be determined by the jury, rather than a judge. *Ring*, 536 U.S. at 589, 122 S.Ct. 2428. *Schriro* held that because the *Ring* rule was procedural, and because it was not a "watershed" rule, it did not apply retroactively. *Schriro*, 542 U.S. at 358, 124 S.Ct. 2519.

¶ 59 The *Ring* rule is procedural, the Court held, because it "d[id] not produce a class of persons convicted of conduct the law does not make criminal," *id.* at 352, 124 S.Ct. 2519, but rather "altered the range of permissible methods for determining whether a defendant's conduct is punishable by death." *Id.* at 353, 124 S.Ct. 2519. *Schriro*'s procedural determination squarely applies to Jensen. The *Miller* rule does not make Jensen's crime less criminal, nor does it act as a categorical bar to a particular sentence.

---

**7.** Because states are not required to adopt the *Teague* retroactivity analysis, *Miller*'s inclusion of *Jackson v. State*, 194 S.W.3d 757 (Ark.2004), which was on collateral review, *Miller*, —— U.S. at ——, 132 S.Ct. at 2461, suggests that the Court left the retroactivity issue to the Arkansas courts to decide. Moreover, had the Court disposed of the retroactivity issue in *Jackson*, it would have been unnecessary for it to grant certiorari in

*Montgomery v. Louisiana*, No. 14–280, which presents two issues: first, the issue raised by the petitioner, namely, whether the Louisiana Supreme Court erred in not applying *Miller* retroactively; and second, the issue added by the Court itself, namely, whether the state court's determination of non-retroactivity raises a federal question within the Court's jurisdiction to review.

Rather, it requires that a certain process be followed before a juvenile can be sentenced to LWOP. To use Schriro's terminology, Miller "altered the range of permissible methods" for sentencing juveniles to LWOP.

¶ 60 *Miller*'s own language makes this point abundantly clear. As noted above, the Court stated: "Our decision does not categorically bar a penalty for a class of offenders or type of crime–as, for example, we did in *Roper* or *Graham.* Instead, *it mandates only that a sentencer follow a certain* process–considering an offender's youth and attendant characteristics–before *imposing a particular penalty.*" —— U.S. at ——, 132 S.Ct. at 2471 (emphasis added). *Miller* itself describes its holding as a procedural one. We therefore find that it is procedural, rather than substantive, in nature.

¶ 61 Because *Miller* is procedural in nature, and is not a "watershed" rule of procedure, it does not apply retroactively to cases on collateral review of a final judgment. It therefore does not apply to Jensen. Accordingly, we affirm the trial court's order denying Jensen's post-conviction motion.

### IV.

¶ 62 For the reasons stated above, in both *Tate* and *Banks,* we reverse in part and affirm in part, and remand the cases for further proceedings consistent with this opinion. In *Jensen,* we affirm the trial court's order denying post-conviction relief.

CHIEF JUSTICE RICE concurs in part and dissents in part.

JUSTICE HOBBS concurs in part and dissents in part.

JUSTICE COATS concurs in part and dissents in part.

JUSTICE HOOD concurs in part and dissents in part, and JUSTICE MÁRQUEZ joins in the concurrence in part and the dissent in part.

CHIEF JUSTICE RICE, concurring in part and dissenting in part.

¶ 63 In *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 2475, 183 L.Ed.2d 407 (2012), the United States Supreme Court decided one thing: that mandatory sentencing schemes requiring life without the possibility of parole ("LWOP") for juvenile offenders violate the Eighth Amendment. But that is all the Court decided. Although the Court held that such sentencing schemes improperly preclude judges from accounting for "the wealth of characteristics and circumstances attendant" to a juvenile's age, *id.* at ——, 132 S.Ct. at 2467, it made no determination regarding *how* judges should weigh those characteristics and circumstances. If our General Assembly wishes to exercise its legislative authority and make that determination–that is, if it seeks to respond to *Miller* and develop a new sentencing scheme for juveniles, whether individualized or automatic–it obviously possesses the power to do so. But it has not so acted.

¶ 64 Today, the majority, rather than the General Assembly, creates an "individualized sentencing process." *See* maj. op. ¶ 4. Specifically, the majority instructs judges to resentence juveniles and to consider their "youth and attendant characteristics" in determining whether they should spend the remainder of their lives in jail, with no possibility of release. *Id.* In so doing, the majority concocts an entirely new sentencing process not yet sanctioned by our General Assembly. Moreover, because *Miller* was silent as to the parameters of such an individualized procedure, the majority's new process is necessarily nebulous, failing to give judges any guidance in how to make such grave decisions.[1] The creation of such a sentencing scheme is the province of the

---

1. What factors, for example, should judges consider in deciding a particular sentence? Should they focus on the juvenile defendant, considering his age, intellectual capacity, and home environment? Should they account for the impact on the victim and his family? What about the manner of the crime, or the extent of the defendant's participation in it? And even if any or all of these variables are relevant, how exactly should judges weigh them? The majority cannot say. The General Assembly can.

legislature. Because this court should not devise new sentencing procedures in the guise of a lawmaking body, I respectfully dissent from all but Part III of the majority's opinion. Because I agree with the majority's retroactivity analysis, I concur in Part III.

¶ 65 In my view, the appropriate remedy in this case is one of severance, a solution that cleanly excises the constitutionally offensive portions of Colorado's sentencing scheme. Certainly, the General Assembly may prefer a different scheme from the one that results from severance. But, as I will show, rather than affirmatively creating a new sentencing process (as the majority does), severance simply removes the problematic language and leaves the remainder of the relevant statutes intact, meaning this court need not introduce de-facto legislation. Should the General Assembly wish to substitute a different sentencing scheme, it should do so.

¶ 66 I begin, however, with a brief overview of *Miller*, highlighting both what it says and, more importantly, what it does not say.

### I. *Miller v. Alabama*

¶ 67 In *Miller*, the Court considered whether the sentencing schemes in Alabama and Arkansas, which mandated LWOP for juvenile offenders who committed homicide crimes, violated the Eighth Amendment's ban on cruel and unusual punishments. *See* — U.S. at — – —, 132 S.Ct. at 2460–63; *see also* U.S. Const. amend. VIII ("[C]ruel and unusual punishments [shall not be] inflicted."). Expanding the constitutional protections for juveniles already recognized in *Roper v. Simmons*, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the Eighth Amendment bars capital punishment for juveniles), and *Graham v. Florida*, 560 U.S. 48, 82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (holding that the Eighth Amendment bars LWOP for juveniles who committed nonhomicide offenses), the Court held that the Eighth Amendment bars *mandatory* LWOP for juveniles who committed homicides. *See* 132 S.Ct. at 2468–69.

¶ 68 Different from *Roper* and *Graham*, however, the Court declined to adopt a categorical rule. *See id.* at —, 132 S.Ct. at 2469 ("[W]e do not consider [defendants'] alternative argument that the Eighth Amendment requires a categorical bar on [LWOP] for juveniles. . . ."). Nevertheless, the Court appeared squeamish about sentences of LWOP for juveniles, stating that "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* The Court further noted that "when given the choice, sentencers impose [LWOP] on children relatively rarely." *Id.* at — n. 10, 132 S.Ct. at 2471 n. 10.

¶ 69 *Miller*, then, is framed entirely in the negative. It forbids schemes that automatically sentence juveniles to LWOP. It provides no detail, however, as to when such an individual sentence *would* be constitutional. Rather, *Miller* simply recognizes that "children are different" and that sentencers must account for such differences. *Id.* at —, 132 S.Ct. at 2469. Therefore, while *Miller* does present a brief laundry-list of children's "hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences," *id.* at —, 132 S.Ct. at 2468–it offers no guidance about how to weigh such features in deciding a juvenile's punishment.

¶ 70 With this understanding of *Miller* in mind, I now turn to the particulars of Colorado's sentencing scheme.

### II. Colorado's Sentencing Scheme

¶ 71 The critical statute here is section 18–1.3–401, C.R.S. (2014), which outlines the presumptive penalties for each class of felony. Under section 18–1.3–401(1)(a), the minimum presumptive penalty for class 1 felonies is "life imprisonment." While subsection (1)(a) uniformly applies life imprisonment as the sentencing floor for offenders who committed class 1 felonies, subsection (4) differently defines "life imprisonment" depending on both the date of the underlying felony and the status of the offender at the time of commission. *See* § 18–1.3–401(4)(a)–(b). As the key provisions of subsection (4) provide in pertinent part:

(a) . . . As to any person sentenced for a class 1 felony, for an act committed on or

after July 1, 1985, and before July 1, 1990, *life imprisonment shall mean imprisonment without the possibility of parole for forty calendar years.* As to any person sentenced for a class 1 felony, for an act committed on or after July 1, 1990, *life imprisonment shall mean imprisonment without the possibility of parole.*

(b)(I) Notwithstanding the provisions of ... paragraph (a) of this subsection (4), as to a [juvenile] who is convicted as an adult of a class 1 felony ... the district court judge *shall sentence the [juvenile] to a term of life imprisonment with the possibility of parole after serving a period of forty calendar years.* ...

(II) The provisions of this paragraph (b) shall apply to persons sentenced for offenses committed on or after July 1, 2006.

(Emphasis added.)

¶ 72 Thus, under subsection (4), "life imprisonment" can mean either LWOP or life with the possibility of parole ("LWPP") after forty years. Because (4)(b) explicitly excepts juvenile offenders who committed class 1 felonies after 2006 from the provisions of (4)(a), the generalized "any person" language in (4)(a) essentially means "all adult offenders and those juvenile offenders not covered by (4)(b)." When (4)(a) is read in relation to juveniles, the first definition of life imprisonment mandates LWPP after forty years for any juvenile offender who committed a class 1 felony between 1985 and 1990, while the second definition of life imprisonment mandates LWOP for any juvenile offender who committed a class 1 felony between 1990 and 2006.[2]

¶ 73 Section 17–22.5–104, C.R.S. (2014), the other statutory provision relevant to this issue, mirrors these sentencing outcomes.[3] Under section 17–22.5–104, which regulates parole eligibility for inmates imprisoned under a life sentence, parole eligibility is differently restricted depending on both the date

of the underlying felony and the status of the offender at the time of commission. As the key provisions of subsection (2)(d) provide:

(I) *No inmate* imprisoned under a life sentence for a class 1 felony committed on or after July 1, 1990, *shall be eligible for parole. ...*

. . . .

(IV) Notwithstanding the provisions of subparagraph (I) of this paragraph (d), *[a juvenile]* imprisoned under a life sentence for a class 1 felony committed on or after July 1, 2006, who was convicted as an adult ... *may be eligible for parole after the inmate has served at least forty calendar years. ...*

(Emphasis added.)

¶ 74 Thus, under (2)(d), an inmate sentenced to life imprisonment is either never eligible for parole (i.e., he faces LWOP) or eligible for parole after forty calendar years (i.e., he faces LWPP after forty years). Because (2)(d)(IV) explicitly excepts juvenile offenders who committed class 1 felonies after 2006 from the provisions of (2)(d)(I), the generalized "inmate" language in (2)(d)(I) essentially means "all adult offenders and those juvenile offenders not covered by (2)(d)(IV)." When (2)(d)(I) is read in relation to juveniles, it eliminates the possibility of parole for any juvenile offender who committed a class 1 felony between 1990 and 2006. In other words, (2)(d)(I) tracks exactly the second definition of life imprisonment in section 18–1.3–401(4)(a), which also mandates LWOP for any juvenile offender who committed a class 1 felony between 1990 and 2006.

¶ 75 Therefore, both section 18–1.3–401 and section 17–22.5–104 contravene the rule announced in *Miller* because they mandate LWOP for certain juvenile offenders who committed class 1 felonies. The majority thus properly recognizes that *Miller* rendered these statutes unconstitutional as ap-

---

2. When referring to the date ranges provided in section 18–1.3–401 and section 17–22.5–104, C.R.S. (2014), I omit the "July 1" language going forward for simplicity.

3. Although section 17–22.5–104 is not part of the criminal code and therefore does not control sentencing determinations, it is nonetheless rele-

vant because the parole regulations outlined in section 17–22.5–104(2)(d) track precisely the sentencing outcomes outlined in section 18–1.3–401(4). Thus, to the extent that portions of section 18–1.3–401(4) are unconstitutional, the concomitant portions of section 17–22.5–104(2)(d) are also unconstitutional.

plied to juveniles. *See* maj. op. ¶ 35. The question, then, is how to cure these statutes of their unconstitutionality. I now illustrate why severance supplies both the cleanest and least invasive response to this question.

### III. Severance

¶ 76 In curing a defective statute, this court possesses the "authority and duty ... to determin[e] whether severance of unconstitutional portions of the statute is viable." *Bd. of Cnty. Comm'rs v. Vail Assocs.*, 19 P.3d 1263, 1280 (Colo.2001), *as modified on denial of reh'g* (Mar. 19, 2001). Indeed, we should apply severance where the doctrine is appropriate. *See id.* ("When we can, we sever any provision that we hold to be unconstitutional from those provisions that stand despite the severance." (emphasis added)). Under Colorado's general severability clause, § 2–4–204, C.R.S. (2014), we may sever or strike any portion of a statute held to be unconstitutional.[4] *Rodriguez v. Schutt*, 914 P.2d 921, 929 (Colo.1996). Because we strike as little of an unconstitutional statute as possible, preferring partial invalidation over complete invalidation, *see Dallman v. Ritter*, 225 P.3d 610, 638 (Colo.2010), severance may be limited to a single word or phrase, *Schutt*, 914 P.2d at 929. Thus, severing portions of a statute is preferred over invalidating the entire statute unless the invalid statutory provisions are so "pervasive or inextricably intertwined with" the valid provisions that severance would render the statute incomplete. *See Riverton Produce Co. v. State*, 871 P.2d 1213, 1226 (Colo.1994); *see also Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1362 (10th Cir.1981) (applying Colorado's general severability clause and explaining that severance "is impossible if the court determines that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with legislative intent"). When deciding whether we can sever unconstitutional provisions from an otherwise valid statute, we consider two factors: (1) the autonomy of the statutory portions that remain after the defective provisions are excised; and (2) the intent of the enacting legislative body. *Dallman*, 225 P.3d at 638.

¶ 77 Here, the temporal restrictions contained in section 18–1.3–401(4)(b) and section 17–22.5–104(2)(d)(IV), which were added to the statute in 2006, cause the constitutional infirmity at issue.[5] Recall that (4)(b) and (2)(d)(IV) except juvenile offenders who committed class 1 felonies *after 2006* from the generalized language in (4)(a) and (2)(d)(I) mandating LWOP for all offenders who committed class 1 felonies after 1990. Thus, by blocking juveniles who committed class 1 felonies *before 2006* from the juvenile exception, (4)(b) and (2)(d)(IV) operate to create the discrete class of juveniles whose sentences are now unconstitutional under *Miller*. Therefore, it is these subsections–and only these subsections–that are problematic.

¶ 78 Applying the two severability factors, the first supports severance because the undisturbed portions of section 18–1.3–401 and section 17–22.5–104 can remain constitutionally valid. The invalid temporal restrictions at issue here are not pervasive parts of either section 18–1.3–401 or section 17–22.5–104. Not only do these restrictions appear only once in their respective statutes–and in exceptions, no less–but they are also nonessential to the overriding purpose of each

---

4. The general severability clause applies to "any legislative act not containing a specific severability provision." *People v. Vinnola*, 494 P.2d 826, 830 (Colo.1972). It is applicable in this case because neither section 18–1.3–401(4) nor section 17–22.5–104 contains a severability provision pertaining to crimes punishable by LWOP. *Cf.* § 18–1.3–401(5) (providing that crimes punishable by death shall be punished by life imprisonment in the event that the death penalty is held to be unconstitutional).

5. In the legislative declaration accompanying the amendments that added (4)(b) and (2)(d)(IV) to sections 18–1.3–401 and 17–22.5–104, respectively, the legislature expressly acknowledged that "it is not in the best interests of the state to condemn juveniles who commit class 1 felony crimes to a lifetime of incarceration without the possibility of parole." *See* H.B. 06–1315, 65th Gen. Assemb., 2d Reg. Sess. (Colo.2006). Recognizing "the rehabilitation potential of juveniles," the legislature amended sections 18–1.3–401(4) and 17–22.5–104(2)(d) so that juveniles who committed class 1 felonies after 2006 became eligible for parole after serving forty calendar years of their life sentences. *Id.*

statute to guide and constrain sentencing and parole eligibility determinations.

¶ 79 Nor are the invalid provisions in (4)(b) and (2)(d)(IV) inextricably intertwined with the valid provisions. Recall that (4)(b) is divided into two subparagraphs, (I) and (II). Subsection (4)(b)(I)–a multi-sentence substantive provision–creates the juvenile exception, and subsection (4)(b)(II)–a single-sentence clarifying provision–limits the group covered by the exception to juveniles who committed class 1 felonies after 2006. Although (4)(b)(II) references (4)(b)(I), no other provision references it. Because the temporal restriction in (4)(b)(II) merely clarifies the scope of the juvenile exception established by (4)(b)(I)–which is enforceable on its own terms–it is clearly separable from the still-valid portions of section 18–1.3–401.

¶ 80 The temporal restriction in (2)(d)(IV) is similarly separable from the still-valid portions of section 17–22.5–104. Recall that (2)(d)(IV)—which is not referenced by any other provision in section 17–22.5–104—both creates the juvenile exception and limits it to felonies "committed on or after July 1, 2006." Although the language limiting the juvenile exception is buried amid the language creating the exception, removing the limiting language does not change the overriding purpose of (2)(d)(IV), which is to except juveniles from the generally applicable provisions of (2)(d)(I) that mandate LWOP. Because the temporal restriction does not inhibit the enforceability of the juvenile exception, it is not inextricably intertwined with the remaining provisions of section 17–22.5–104.

¶ 81 The second severability factor similarly supports severance, as the newly severed statutes still accord with the legislature's intent. Unless it is evident that the legislature would not have enacted the valid portions of section 18–1.3–401 and section 17–22.5–104 independently of the invalid temporal restrictions in (4)(b) and (2)(d)(IV), the invalid temporal restrictions may be expunged. *See Champlin Refining Co. v. Corp. Comm'n*, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932). The statutory context, which systematically subjects juveniles who committed class 1 felonies to mandatory penalties, sug-

gests that the legislature would have enacted the still-valid portions of section 18–1.3–401 and section 17–22.5–104 even without the invalid temporal restrictions in (4)(b) and (2)(d)(IV). Recall that section 18–1.3–401(1) establishes the minimum and maximum presumptive penalties for every class of felony. Regardless of the date of commission, the minimum presumptive penalty for all class 1 felonies is "life imprisonment" and the maximum presumptive penalty is death. Because juveniles cannot receive death sentences, *see Roper*, 543 U.S. at 578, 125 S.Ct. 1183, life imprisonment is the compulsory penalty for all juveniles convicted of class 1 felonies. Although subsection (4) differently defines life imprisonment as either LWOP or LWPP after forty years depending on the date that the underlying felony was committed, both definitions are statutorily mandated.

¶ 82 In other words, section 18–1.3–401 is designed to foreclose the possibility of discretionary sentencing determinations for juveniles convicted of class 1 felonies. By simply replacing mandatory LWOP with mandatory LWPP after forty years for juveniles who committed class 1 felonies, the severed statutes align seamlessly with the broader statutory context, suggesting that the legislature would have enacted section 18–1.3–401 and section 17–22.5–104 without their invalid portions.

¶ 83 Finally, the legislatively defined purposes of Colorado's Criminal Code suggest that the legislature would have enacted the valid portions of section 18–1.3–401 and section 17–22.5–104 without the invalid temporal restrictions. Section 18–1–102.5, C.R.S. (2014), lists the legislatively defined purposes of the Code with respect to sentencing. One of these purposes is to "assure the fair and consistent treatment of all convicted offenders by eliminating unjustified disparity in sentences." § 18–1–102.5(1)(b). The severed versions of section 18–1.3–401 and section 17–22.5–104 embody this purpose by ensuring that juveniles who happened to commit class 1 felonies between 1990 and 2006—and were therefore sentenced to mandatory LWOP under the old scheme—are treated the same as juvenile offenders who were sentenced to LWPP after forty years simply

because they happened to commit their class 1 felonies before 1990 or after 2006. Because severing the temporal restrictions in (4)(b) and (2)(d)(IV) directly furthers one of the Code's basic objectives of sentencing—assuring fair and consistent treatment of convicted offenders—it is likely that the legislature would have enacted section 18–1.3–401 and section 17–22.5–104 without these invalid provisions.

¶ 84 Accordingly, I would simply apply severance to the two unconstitutional statutes at issue. In particular, I would excise the following language from section 18–1.3–401(4), as designated by strikethrough font:

> (b)(I) Notwithstanding the provisions of ... paragraph (a) of this subsection (4), as to a [juvenile] who is convicted as an adult of a class 1 felony ... the district court judge shall sentence the [juvenile] to a term of life imprisonment with the possibility of parole after serving a period of forty calendar years....
>
> ~~(II) The provisions of this paragraph (b) shall apply to persons sentenced for offenses committed on or after July 1, 2006.%)~~

Analogously, I would also excise the following language from section 17–22.5–104(2)(d), as designated by strikethrough font:

> (I) No inmate imprisoned under a life sentence for a class 1 felony committed on or after July 1, 1990, shall be eligible for parole....
>
> ....
>
> (IV) Notwithstanding the provisions of subparagraph (I) of this paragraph (d), [a juvenile] imprisoned under a life sentence for a class 1 felony ~~committed on or after July 1, 2006,%)~~ who was convicted as an adult ... may be eligible for parole after the inmate has served at least forty calendar years....

After severing the statutes in this fashion to rid them of their invalid temporal restrictions, juveniles who committed class 1 felonies between 1990 and 2006 would be subject to mandatory LWPP after forty years.[6]

---

6. The majority asserts that "severing anything would mean changing the application of the statute to adults as well." Maj. op. ¶ 42. But my suggested method of severance does no such

## IV. Conclusion

¶ 85 *Miller* outlaws mandatory sentences of LWOP for juveniles. But it does not dictate how a state should cure such sentencing schemes, and it certainly does not articulate in any detail when it is appropriate for a state to sentence a juvenile to LWOP. Nor has our General Assembly yet provided any such details regarding juvenile sentencing post-*Miller*. The majority nevertheless uses *Miller*'s unremarkable acknowledgement that juveniles are creatures of "youth and [its] attendant characteristics" to bootstrap an invented individualized sentencing process onto the Court's holding. But because the majority does not–and could not–explain *how* judges should weigh these characteristics, this newfangled process will necessarily be vague and uncertain. It is for the legislature, not this court, to develop such a sentencing scheme if it so desires. *See United States v. Booker*, 543 U.S. 220, 265, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) ("Ours, of course, is not the last word: The ball now lies in [the legislature's] court.").

¶ 86 If our General Assembly wishes to revise Colorado's sentencing scheme to comply with *Miller*, it is well within its powers to do so. Until it acts, however, this court should rectify the scheme in the least intrusive way possible. As such, I would simply sever the constitutionally offensive portions of the statutes as described. *See supra* ¶ 84. I would thus direct the trial court to apply the revised sentencing scheme and automatically resentence both Tate and Banks to LWPP after forty years. Accordingly, I respectfully dissent from all but Part III of the majority's opinion. Because I agree with the majority's retroactivity analysis, I concur in Part III.

JUSTICE HOBBS, concurring in part and dissenting in part.

¶ 87 I agree with Chief Justice Rice's severance analysis and therefore, while concurring in Part I of the majority opinion, I

---

thing. The only language that I would excise pertains exclusively to juveniles; following such severance, the sentencing of adults would remain unchanged.

dissent from Part II of the majority opinion, and I agree with Justice Hood's retroactivity analysis and therefore dissent from Part III of the majority opinion.

JUSTICE COATS, concurring in part and dissenting in part.

¶ 88 While I agree with the majority that in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012), the Supreme Court created a new rule of criminal procedure not applicable to convictions already final before its announcement, I do not agree with the majority about the precise nature of that new rule or its impact on the sentencing statutes of this jurisdiction. In particular, I disagree with the justification offered by the majority for judicially redefining "life imprisonment," as that statutory term applied to juveniles sentenced for class 1 felonies during the times pertinent to these cases, maj. op. ¶¶ 32–34, taking it from having a meaning of "imprisonment without the possibility of parole," to effectively meaning imprisonment without the possibility of parole *unless* that sentence would be constitutionally disproportionate, in which case having a meaning of imprisonment "with the possibility of parole after forty years," maj. op. ¶ 32. Besides not agreeing that any statute of this jurisdiction needs amending or replacing, I am troubled by the majority's assertion that notwithstanding the inapplicability of the palliative doctrines of severance and revival, a court may (in the absence of legislative replacement itself) simply decide what kind of sentencing provision the legislature would have preferred had it known its first choice would be disallowed, and then judicially effect that preference on behalf of the legislature. Because I believe the judiciary lacks the power to legislate, no matter how confident it may be of legislative preferences never actually enacted; and because I believe, in any event, the new procedural rule announced in *Miller* merely requires an individualized proportionality determination for juveniles sentenced to the harshest available sentence, I concur in only a part of the majority opinion.

¶ 89 By analogizing life-without-parole, as the harshest sentence constitutionally per-missible for juveniles, to the death penalty, the Supreme Court in *Miller* concluded that imposing such a life sentence without individualized consideration of the juvenile's age and age-related characteristics would create too great a risk of a disproportionate sentence. *Miller,* —— U.S. at ——, 132 S.Ct. at 2469. The Supreme Court reached that conclusion by seeing it as the intersection of two separate strands of its proportionality jurisprudence: the first involving categorical bans on certain sentences for juveniles, *see Roper v. Simmons,* 543 U.S. 551, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (banning death penalty for juveniles); *Graham v. Florida,* 560 U.S. 48, 76–80, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (banning life-without-parole for nonhomicide offenses committed by juveniles), and the second requiring individualized sentencing for the death penalty, the harshest sentence available for the general population. Rather than finding a new categorical ban for juveniles or extending the complex process of jury balancing required for death sentences, the Court chose to take a step it had previously rejected, even for the most serious and violent crimes, and found that the question whether a life-without-parole sentence for juveniles convicted of homicide offenses is constitutionally disproportionate cannot be resolved without consideration of the individual characteristics of each defendant.

¶ 90 In *Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Supreme Court was invited to extend the individualized capital sentencing doctrine to life-without-parole, and it emphatically refused to do so. (Scalia, J., writing for a majority of the Court at Part IV). In *Close v. People,* 48 P.3d 528, 530 (Colo.2002), this court parsed to a fare-thee-well the reasoning of *Harmelin,* as the final word in proportionality jurisprudence at the time, concluding that only an "abbreviated proportionality review" was initially required of any but death sentences, and only if that abbreviated proportionality review were to give rise to an inference of gross disproportionality would an "extended proportionality review" be required. I believe *Miller* is best understood as adding a new layer, or perhaps wrinkle, to the Court's proportionality juris-

prudence, singling out juvenile sentences of life-without-parole as a class of sentences which, in the absence of individualized consideration of the age and age-related characteristics of the juvenile defendant, "pose too great a risk of disproportionate punishment." *Miller*, —— U.S. at ——, 132 S.Ct. at 2469. Rather than striking down state statutes not providing for juvenile homicide sentences less harsh than life-without-parole, I understand *Miller* to simply mandate an individualized consideration of the constitutional proportionality of such sentences when imposed on a juvenile.

¶ 91 We have long recognized that even statutorily mandated sentences are subject to review concerning their proportionality for Eighth Amendment purposes, *see Close*, 48 P.3d at 538–39, and if such a sentence is found to be disproportionate, the defendant must be resentenced in a manner that meets constitutional limitations. We have never suggested, and I believe it is clearly not the case, that a recidivist sentencing statute is unconstitutional simply because its mandatorily prescribed formula results in a disproportionate sentence in a given case. So too, a juvenile sentence of life-without-parole for capital murder is subject to a proportionality review. Although the abbreviated review required of such a sentence prior to *Miller* was adequate to demonstrate that the sentence was, on its face, not grossly disproportionate, since *Miller* that proportionality determination cannot be made without individualized consideration of the age and age-related characteristics of the particular defendant. And if that life-without-parole sentence is found to be disproportionate upon an individualized proportionality review, according to the standards implied in *Miller*, the juvenile must be resentenced to a constitutionally proportionate sentence.

¶ 92 Because neither this court nor the Supreme Court has had occasion to review a sentence imposed in the wake of a determination that a statutorily mandated sentence was disproportionate, the principles governing such resentencing have not been firmly established. Because my understanding of *Miller* has not carried the day, there seems little point in working out in detail the possibilities for resentencing, should an individual-

ized proportionality review result in a finding of disproportionality in some particular case, except to note that unlike the court of appeals, *see People v. Valdez*, 56 P.3d 1148 (Colo.App.2002); *id.* at 1154–55 (Dailey, J., dissenting), I believe a proper application of existing proportionality principles would require that the defendant be sentenced to the harshest available proportionate sentence included in the disproportionate mandatory sentence. And in this regard, I note only that this jurisdiction recognized, at the time pertinent here, a life sentence as to which parole eligibility commenced after forty years, § 18–1.3–406, C.R.S. (2014), as well as a sentence to forty-eight years for less culpable murders, with parole eligibility determined as with all felony sentences to a term of years. *See* § 18–1.3–401, C.R.S. (2014); *see also Ankeney v. Raemisch*, 2015 CO 14, 344 P.3d 847.

¶ 93 With regard to the question of retroactivity, I concur in the majority's conclusion that *Miller* creates a new rule of criminal procedure of a kind that we and the Supreme Court have held inapplicable to judgments already surviving direct review. Whatever its underlying rationale concerning the culpability of juveniles may portend, *see Miller*, —— U.S. at ——, 132 S.Ct. at 2482 (Roberts, C.J., dissenting), the *Miller* majority's choice to decline (at least for the time being) carving out another categorical ban and instead to merely mandate a new procedure cannot be ignored. To the extent that *Miller* merely adds a new component to its jurisprudence governing proportionality reviews, as I believe, Supreme Court precedent for not applying new rules governing individualized review to convictions already past direct review is even more clear. *See, e.g., Schriro v. Summerlin*, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (concluding that the new rule prohibiting sentencing judges from finding aggravating circumstance necessary for imposition of death penalty not to be applied retroactively); *see generally* 7 Wayne LaFave et al., *Criminal Procedure* § 28.6(e) (3d ed.2014).

¶ 94 I also concur in the majority's analysis concluding that the doctrines of severance and revival cannot apply to this situation.

While the result of my approach may ultimately be the same or similar to that of the majority, I am nevertheless concerned about the majority's suggestion that this court can simply implement what it believes to be the wish of the legislature, notwithstanding the failure of the accepted doctrines of severance and revival to produce that result. These two related doctrines have developed as acceptable rationales for leaving in place constitutional enactments or constitutional portions of enactments when the legislature's full, or most recent, enactment cannot survive constitutional scrutiny. The fact that legislative intent is a necessary condition for leaving in effect some constitutional residue, however, in no way implies that legislative intent is a sufficient condition for judicial substitution of an entirely new enactment. And I find it less than comforting to simply declare this a unique situation as to which this, at least questionable, exercise of legislative power will henceforth be limited.

¶ 95 Because I agree with the majority that *Miller* creates a new rule of criminal procedure that is inapplicable to judgments already surviving direct review, but I believe that new rule has merely a limited impact on the Court's existing proportionality jurisprudence, I concur in part and dissent in part.

JUSTICE HOOD, concurring in part and dissenting in part.

¶ 96 I join Parts I and II of the majority opinion. I disagree, however, with the majority's retroactivity analysis. As the majority notes, substantive rules apply retroactively to cases on collateral review. A rule is substantive if it prohibits a category of punishment for a class of defendants because of their status. While the Supreme Court did not entirely ban life without parole ("LWOP") sentences for juvenile homicide offenders in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), it declared unconstitutional a category of punishment—namely, *mandatory* life imprisonment without the possibility of parole—for juveniles as a class because of their status as juveniles. Accordingly, *Miller* should apply retroactively to Jensen. I therefore respectfully dissent from Part III of the majority opinion.[1]

¶ 97 To determine if a new rule should be applied retroactively to post-conviction proceedings, we ask three questions: "(1) whether the defendant's conviction is final; (2) whether the rule in question is in fact new; and (3) if the rule is new, whether it meets either of the two *Teague* exceptions to the general bar on retroactivity." *Edwards v. People*, 129 P.3d 977, 983 (Colo.2006) (adopting the Supreme Court's test for retroactivity outlined in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion)). The majority is correct that Jensen's conviction is final and that *Miller* announced a new rule. Thus, I need not analyze the first two parts of the *Teague* test. Our disagreement arises in part three.

¶ 98 The Supreme Court created two "narrow" exceptions to the maxim that new rules do not apply retroactively to post-conviction proceedings. *Butler v. McKellar*, 494 U.S. 407, 408, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). The first exception is for a watershed rule of criminal procedure. *Teague*, 489 U.S. at 307–10, 109 S.Ct. 1060. In this context, to qualify as "watershed," the rule must implicate "the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257 (1990); *see also Teague*, 489 U.S. at 311, 109 S.Ct. 1060 (characterizing a new rule as watershed where it involves "new procedures without which the likelihood of an accurate conviction is seriously diminished"). I agree with the majority that *Miller* is not a watershed rule in that sense.

¶ 99 The second exception is for new substantive rules. A substantive rule "alters the range of conduct or the class of persons that the law punishes." *Schriro v. Summerlin*,

---

1. Jensen is one of approximately forty-eight juvenile offenders serving a mandatory LWOP sentence in Colorado. These forty-eight offenders are part of a much larger nationwide problem: When the Supreme Court decided *Miller*, at least 2,100 juvenile homicide offenders across the country were serving mandatory LWOP sentences. *See* Ashby Jones, *Life Sentences' Blurred Line*, Wall St. J., Sept. 4, 2013, at A3, *available at* http://online.wsj.com/public/resources/documents/print/WSJ_-A003–20130904.pdf (last visited May 29, 2015).

542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). It either "places a class of private conduct beyond the power of the State to proscribe," *Saffle*, 494 U.S. at 494, 110 S.Ct. 1257 (internal quotation marks omitted), or "prohibit[s] a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Substantive rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal," *Bousley v. United States*, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal quotation marks omitted), or "faces a punishment that the law cannot impose upon him," *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519. By contrast, a rule is procedural if it "regulates only the *manner of determining* the defendant's culpability." *Edwards*, 129 P.3d at 984 (quoting *Schriro*, 542 U.S. at 353, 124 S.Ct. 2519) (emphasis in original) (internal quotation marks omitted).

¶ 100 Despite having some attributes that are procedural, the rule announced in *Miller* is ultimately substantive in nature. The majority is correct that the *Miller* rule requires a new procedure for sentencing juvenile homicide offenders—courts must now hold a hearing providing for individualized sentencing in light of considerations of the unique circumstances of youth. *Miller*, ⸺ U.S. at ⸺, 132 S.Ct. at 2471. But "the procedural rule for a hearing is the result of a substantive change in the law that prohibits mandatory life-without-parole sentencing" for juvenile homicide offenders. *State v. Ragland*, 836 N.W.2d 107, 115 (Iowa 2013). This substantive change in the law mandates "a sentencing range broader than that provided by statute for minors convicted of first degree murder who could otherwise receive only natural life imprisonment." *People v. Davis*, 379 Ill.Dec. 381, 6 N.E.3d 709, 722 (Ill.2014) (internal quotation marks omitted). Thus, *Miller* prohibits a certain category of punishment (mandatory LWOP) for a class of defendants (juvenile homicide offenders) because of their status (juveniles). That a

court may still sentence a juvenile homicide offender to LWOP after a hearing considering his unique circumstances and the nature of his crime does not change the Supreme Court's holding that *mandatory* LWOP is a category of punishment now beyond the reach of the government.

¶ 101 Further, in *Miller*, the Supreme Court relied on *Graham v. Florida*, 560 U.S. 48, 74, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), which has been applied retroactively because of its substantive ban on LWOP sentences for juvenile nonhomicide offenders. The Court in *Miller* explained that its decision was based, in part, on "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Miller*, ⸺ U.S. at ⸺, 132 S.Ct. at 2463 (citing *Graham*, 560 U.S. at 60–62, 130 S.Ct. 2011). It then drew on *Graham*'s "likening of [LWOP] sentences imposed on juveniles to the death penalty itself." *Id.* at ⸺, 132 S.Ct. at 2466. In a sense then, *Graham* is *Miller*'s precursor. And that precursor has been applied retroactively on collateral review. *See, e.g., In re Moss*, 703 F.3d 1301, 1303 (11th Cir.2013) (holding a juvenile nonhomicide offender "made a prima facie showing that *Graham* has been made retroactive on collateral review"); *In re Sparks*, 657 F.3d 258, 261–62 (5th Cir.2011) (holding *Graham* is retroactive on collateral review). "If a substantial portion of the authority used in *Miller* has been applied retroactively, *Miller* should logically receive the same treatment." *Ragland*, 836 N.W.2d at 116. Indeed, "the substance of the *Miller* rule is no different than the rule[ ] established in ... *Graham*." *Songster v. Beard*, 35 F.Supp.3d 657, 663 (E.D.Pa.2014).

¶ 102 In that vein, the Supreme Court itself applied *Miller* retroactively in its companion case, *Jackson v. Hobbs*, which was before the Court on collateral review. ⸺ U.S. at ⸺⸺⸺, 132 S.Ct. at 2461–62 (outlining factual and procedural history of Jackson's case). Without engaging in a *Teague* analysis, the Court retroactively applied *Miller* to vacate the defendant's sentence. *Id.* at 2463. Admittedly, the absence of any retroactivity analysis is cryptic, but I

agree with other courts that have observed that "the relief granted to Jackson under *Miller* tends to indicate that *Miller* should apply retroactively on collateral review." *Davis*, 6 N.E.3d at 722; *see also Ragland*, 836 N.W.2d at 116; *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 466 Mass. 655, 1 N.E.3d 270, 281–82 (2013).

¶ 103 These other courts are part of a growing majority concluding that the *Miller* rule is substantive. Of the fifteen state supreme courts that have issued opinions concerning *Miller*'s retroactivity, nine have applied the *Miller* rule retroactively. *See Davis*, 6 N.E.3d at 722 (holding *Miller* created a new substantive rule and applies retroactively); *Ragland*, 836 N.W.2d at 115–17 (same); *Diatchenko*, 1 N.E.3d at 278–82 (same); *Jones v. State*, 122 So.3d 698, 701–02 (Miss.2013) (same); *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716, 729–31 (2014) (same); *Petition of State*, 166 N.H. 659, 103 A.3d 227, 233–36 (2014) (same); *Aiken v. Byars*, 410 S.C. 534, 765 S.E.2d 572, 575–76 (2014) (same); *State v. Mares*, 335 P.3d 487, 504–08 (Wyo.2014) (reaching same conclusion but addressed as a certified question from the trial court); *see also Ex Parte Maxwell*, 424 S.W.3d 66, 75 (Tex.Crim.App.2014) (reaching same conclusion as the court of last resort for criminal matters in Texas). Two others have done so without explicitly analyzing the issue under the retroactivity doctrine. *See Jackson v. Norris*, 426 S.W.3d 906, 907 (Ark.2013) (remanding for sentencing hearing without explicitly ruling on retroactivity issue); *Horsley v. State*, 160 So.3d 393, 395, 406 (Fla.2015) (applying legislative amendment to require individualized sentencing for "all juvenile offenders whose sentences are unconstitutional under *Miller*" because it is "most faithful to the Eighth Amendment principles established by the United States Supreme Court"). Only five states have concluded it is not retroactive. *Ex Parte Williams*, — So.3d ——, ——, No. 1131160, 2015 WL 1388138, at *13 (Ala. Mar. 27, 2015); *State v. Tate*, 130 So.3d 829, 838 (La. 2013); *People v. Carp*, 496 Mich. 440, 852 N.W.2d 801, 827–28 (2014); *Chambers v. State*, 831 N.W.2d 311, 331 (Minn.2013);

*Commonwealth v. Cunningham*, 622 Pa. 543, 81 A.3d 1, 11 (2013).[2]

¶ 104 Finally, the Attorney General has conceded that *Miller* is retroactive. While such a concession is not binding on this court, it is certainly telling. As the First Circuit has explained when relying on the prosecution's concession that *Miller* applies retroactively,

> The government plays a central role in criminal law enforcement. Moreover, it is fair to say that the government is generally resistant to collateral review of criminal convictions and sentences. Accordingly, one might conclude that where the government concedes that a rule favoring prisoners has been made retroactive, that position has at least "possible merit … warrant[ing] a fuller exploration by the district court."

*Evans-Garcia v. United States*, 744 F.3d 235, 238 (1st Cir.2014) (quoting *Rodriguez v. Superintendent*, 139 F.3d 270, 273 (1st Cir. 1998), *abrogated on other grounds as stated in Simpson v. Matesanz*, 175 F.3d 200, 212–13 (1st Cir.1999)); *see also Johnson v. United States*, 720 F.3d 720, 720 (8th Cir.2013) (relying on government concession of Miller's retroactivity); *Wang v. United States*, No. 13-2426 (2d Cir. July 16, 2013) (unpublished) (same).

¶ 105 For all these reasons, the rule announced in *Miller* is substantive and, as a result, should apply retroactively. I would hold that the *Miller* rule applies to Jensen, vacate his sentence of mandatory LWOP, and remand the case to the trial court to hold a sentencing hearing in accordance with Parts I and II of the majority opinion. Therefore, I respectfully dissent from Part III of the majority opinion.

I am authorized to state that JUSTICE MÁRQUEZ joins in this concurrence in part and dissent in part.

---

2. The Supreme Court recently granted certiorari to address this issue in *Montgomery v. Louisiana*,

— U.S. ——, 135 S.Ct. 1546, 191 L.Ed.2d 635 (2015).